303 F.2d 253
 ATLANTIC MUTUAL INSURANCE COMPANY, a corporation, Appellant,
v.
Robert J. COONEY, doing business under the firm name and
style of Allied Enterprises, and National Union
Fire Insurance Company of Pittsburgh,
Pa., a corporation, Appellees.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., a
corporation, Appellant,
v.
Robert J. COONEY, doing business under the firm name and
style of Allied Enterprises, Appellee.
Robert J. COONEY, doing business under the firm name and
style of Allied Enterprises, Appellant,
v.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., a
corporation, Appellee.
 No. 16842.
 United States Court of Appeals Ninth Circuit.
 Feb. 26, 1962, Rehearing Denied May 15, 1962.
 
 1
 George H. Hauerken, Cyril Viadro, Hauerken, St. Clair, Zappettini & Hines, San Francisco, Cal., for appellant Atlantic Mut. Ins. Co.
 
 
 2
 Bert W. Levit, John B. Hook, Long & Levit, San Francisco, Cal., for appellant, National Union Fire Ins. Co. of Pittsburgh, Pa.
 
 
 3
 Before POPE and HAMLEY, Circuit Judges, and JAMESON, District Judge.
 
 
 4
 JAMESON, District Judge.
 
 
 5
 This action was instituted against Robert J. Cooney, a citizen of California, doing business as Allied Enterprises, by Atlantic Mutual Insurance Company, a New York corporation, as assignee and subrogee of Army and Air Force Exchange Service, a government instrumentality. National Union Fire Insurance Company, a Pennsylvania corporation, intervened pursuant to leave of court.
 
 
 6
 Cooney is an export packer, who packages goods for export. Exchange was one of his customers. On August 15, 1952, Cooney and Exchange entered into an export packing agreement whereby Cooney agreed, 'pursuant to purchase orders to be issued' by Exchange, 'to receive merchandise from delivering carriers or vendors and to pack and perform all other necessary work * * *'. Purchase orders were thereafter issued by Exchange to Cooney, and Cooney began doing a substantial amount of export packing for Exchange.
 
 
 7
 The contract of August 15, 1952, provided in paragraph 7:
 
 
 8
 '7. Export Packer (Cooney) agrees to accept full liability as an insurer of the property of Exchange Service and the property of others for which Exchange Service may be liable while said property of Exchange Service and property of others is in the care, custody, or control of said Export Packer; and Export Packer further agrees to reimburse the Exchange Service in full for any physical loss or damage to the aforementioned property, arising from any cause whatsoever occurring while such property is in the care, custody, or control of Export Packer.'
 
 
 9
 On October 16, 1953, a fire (which started on adjoining premises and did not involve any negligence on his part) occurred at Cooney's warehouse and destroyed over $350,000 worth of Exchange merchandise, which Cooney had in his possession for packing.
 
 
 10
 On Octover 1, 1950, Atlantic had issued an open policy of insurance to Exchange which covered all of the Exchange's export shipments against loss by fire, and liability for loss at the Coonery warehouse being limited to $100,000.[1] This policy contained the following provisions:
 
 
 11
 '25. Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.
 
 
 12
 '30. (C) Warranted by the Assured free from liability for loss or damage to goods in the possession of any carrier or other bailee who may be liable therefor. However, this Company agrees to pay to the Assured the difference between the amount which would be a claim under this policy if it did not contain this warranty and the amount recoverable by the Assured from such carrier or bailee, plus the costs and expenses of prosecuting the claim against such carrier or bailee. Pending collection from such carrier or bailee this Company agrees to advance as a loan such amount which would be a claim under this policy if it did not contain this warranty, repayable only to the extent of any net recovery from such carrier or bailee.'
 
 
 13
 The rates of premium were based on the value of export shipments and were affected by Exchange's loss experience, as well as by recoveries which Exchange might make from others, such as carriers or bailees.
 
 
 14
 On October 30, 1953, Cooney signed another agreement with Exchange, acknowledging full liability as an insurer for the loss resulting from the fire to the property of Exchange, and agreeing to make payment on the loss.
 
 
 15
 After the fire Atlantic did not rely on the $100,000 limitation, but paid Exchange the total loss, less some $25,000 which had been paid by Cooney. On Atlantic's first payment of $200,000, it took an assignment from Exchange, and on the second and third payments totaling approximately $126,000 (made after suit was started), Atlantic took subrogation receipts from Exchange. Atlantic also paid $28,142.07 on account of salvage and other expenses.
 
 
 16
 On February 1, 1953, National had issued to Cooney a $50,000 policy of insurance covering Cooney for his liability to customers for loss or damage to their property from specified perils, including fire. The amount of the policy was increased to $100,000 on May 1, 1953. On June 25, 1953, National issued two certificates of insurance to Cooney at his request, but Exchange did not receive any certificate until after the fire. The agent who wrote the National policy for Cooney had on August 15, 1952, as agent for another company, sent a certificate of insurance of that company to Exchange. Exchange had no knowledge until after the fire of the change in policies.
 
 
 17
 National received oral notice of the fire on October 16, 1953, and written notice on October 26, 1953. Cooney filed proof of loss, which was received by National on November 27, 1953, and supplemental proof of loss, received on April 7, 1954.
 
 
 18
 On February 18, 1954, Cooney was served with process in the action instituted by Altlantic and tendered the defense to National. Cooney refused to execute a non-waiver agreement, and National rejected the defense. Thereafter National was permitted to intervene to assert nonliability under its policy. In asserting nonliability, National relies primarily upon three provisions of its policy:
 
 
 19
 1. '* * * This Company is not liable for any loss or damage, which without its consent, has been settled or compromised by the Assured.'
 
 
 20
 2. 'This policy shall be void if the Assured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof * * *'
 
 
 21
 3. 'Other Insurance. It is expressly agreed that this insurance shall not cover to the extent of any other insurance whether prior or subsequent hereto in date, and by whomsoever effected, directly or indirectly, covering the same property and this Company shall be liable for loss or damage only for the excess value beyond the amount of such other insurance.'
 
 
 22
 The case was tried in two phases. Phase I was upon the issues raised by the intervention pleadings, to resolve the question of whether or not (assuming there was liability on the part of Cooney) National was liable to Cooney under its policy. Phase I was tried in June, 1956, before Judge Hamlin and resulted in judgment is favor of Cooney.
 
 
 23
 Phase II was tried before Judge Goodman in November, 1959, on the issues raised by the pleadings in Atlantic v. Cooney, to resolve the question of whether Cooney was liable to Atlantic as assignee and subrogee of Exchange. Judge Goodman found in favor of Cooney.
 
 
 24
 National has appealed from the judgment entered on phase I. Atlantic has appealed from the judgment entered on phase II. Cooney has adopted the briefs of Atlantic on the appeal of the first phase and the briefs of National on the second phase of the case.
 
 
 25
 It appears more logical in this opinion to consider first the primany question of whether Cooney is liable to Atlantic. While the question of whether National was liable to Cooney was tried first,[2] when this phase of the case was determined adversely to National the principal action was then defended by National on behalf of both Cooney and National.
 
 
 26
 Atlantic contends that the trial court (on the second phase) erred: (1) in holding that Cooney would be liable only for loss or damage resulting from his own fault or negligence; (2) in finding that Exchange did not intend to assign its rights against Cooney to Atlantic and Atlantic did not intend to take an assignment of those rights, but that the intention of the parties was to preserve to Atlantic any rights it might have as subrogee; and (3) in holding that Atlantic is not entitled to recover from Cooney by way of subrogation. In addition to relying on the findings of the trial court on these issues, National contends that the agreement between Cooney and Exchange is invalid because (a) it is too uncertain to be enforceable and is without consideration, and (b) is lacking in mutuality of remedy.
 
 
 27
 Clause 7 of the Cooney-Exchange agreement, quoted supra, specifically provides that Cooney accepted 'full liability as an insurer' of the Exchange property in his care, custody, or control and that he would reimburse Exchange in full for any physical loss or damage to that property 'arising from any cause whatsoever occurring while such property' is in his care, custody, or control. In our opinion this provision is clear and unambiguous. No extrinsic evidence was needed for its construction. Under its provisions Cooney agreed to assume liability for loss or damage to the Exchange property in his possession irrespective of fault on his part.
 
 
 28
 In support of its contention that the agreement is not valid or enforceable, National argues first that there is no mutuality of obligations, in that the contract is too uncertain to be enforced and is without sufficient consideration. It is true, as National contends, that most of the contract provisions specify obligations on the part of Cooney. The only obligation assumed by Exchange was set forth in the first sentence of paragraph 4, which reads: 'For the work and services performed by Export Packer (Cooney), Exchange Service agrees to pay the rates and charges as shown on individual purchase orders or as otherwise agreed to.' Under paragraph 2, Cooney agreed, 'Pursuant to purchase orders to be issued by Exchange Service * * * to receive merchandise * * * and to pack and perform all other necessary work * * *.'
 
 
 29
 There is nothing in the contract which would require Exchange to deliver or Cooney to accept any ascertainable quantity of merchandise. If this were an action by Exchange to Compel Cooney to pack its merchandise or by Cooney to compel Exchange to give him any merchandise to pack, National's point would be well taken. The merchandise which was destroyed in the fire, however, had in fact been delivered by Exchange to Cooney pursuant to a purchase order. To that extent the contract had been performed and executed. Although the contract was not enforceable at its inception, it became valid and binding to the extent that it was executed and performed.
 
 
 30
 The rule here applicable was well stated by the District Court of Appeal of California, First District, in Mason v. Rolando Lumber Co., 1952, 111 Cal.App.2d 79, 243 P.2d 814, 815: 'Appellant further argues that the contract lacked mutuality and was too uncertain to be enforced. Though an executory contract may be unenforceable because of lack of mutuality or uncertainty that defense is no longer available where the contract has been executed, as here by the delivery of the lumber pursuant to its terms, (citing cases) * * *.'[3]
 
 
 31
 In Willard, Sutherland & Co. v. United States, 1923, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086, it was held that a contract for the purchase of coal by the Government which did not require the Government to take, or limit its demand, to any ascertainable quantity, was unenforceable for lack of consideration and mutuality, but to the extent to which the contract was performed through the delivery of coal, the contract became valid and binding.[4]
 
 
 32
 With respect to mutuality of remedy, National argues that Exchange as an instrumentality of the United States Government is immune from suit; that Cooney could not have enforced the agreement against Exchange; and that accordingly Atlantic is barred from recovery since the action is 'brought by Atlantic in the right of Exchange'.
 
 
 33
 We cannot agree with National that the 'nature of the action is not for specific performance rather than for damages'. Here Atlantic, as subrogee of Exchange, seeks damages for breach of Cooney's contract to indemnify Exchange for the merchandise destroyed. Had the merchandise not been destroyed, Cooney would have been entitled to payment for his services.
 
 
 34
 It is well settled that the Government has the right to make contracts and hold and dispose of property, and, for the protection of its contract and property rights, it may resort to the same remedies as a private person.[5] We find no merit in National's contention that Exchange could not have recovered from Cooney by reason of lack of mutuality of remedy.
 
 
 35
 We come now to the question of whether Atlantic, by way of subrogation, may recover from Cooney. More specifically, may the insurer of a bailor recover from a bailee who has expressly agreed to be absolutely liable for the merchandise entrusted to him?
 
 
 36
 Ordinarily a fire insurance company which pays an insured loss for which a third person is primarily responsible is subrogated to the claim of the insured against the third person. This 'right of subrogation is not limited to cases where the liability of the third person is founded in tort; but any right of insured to indemnity, including a right based on contract, will pass to insurer on payment of the loss'. 46 C.J.S. Insurance 1211(a)(1), pp. 176, 178.
 
 
 37
 In Chicago, St. L. & N.O.R. Co. v. Pullman Southern Car Co., 1891, 139 U.S. 79, 83, 11 S.Ct. 490, 493, 35 L.Ed. 97, 101, the defendant reilroad company had agreed to repair all damages of every kind occasioned by accident or negligence to cars hired by it while the cars were in actual transit or in the yards and sheds of the railroad company for the purpose of being cleaned and resupplied for another trip. The owner of the cars carried policies of insurance, had made settlement with the insurance companies, and had agreed with the insurance companies to institute the action against the railroad company for their joint benefit. With respect to the right of recovery by way of subrogation, the court said in part: 'Upon payment of the loss, or to the extent of any payment by them on account of such, loss, the insurance companies were subrogated to the rights of the insured, and could, in the name of the insured, or in their joint names, maintain an action against the railroad company for indemnity, if that company was liable to the insured for the loss of the cars.'
 
 
 38
 The agreement in the Pullman case would seem to have created a bailment of the sleeping cars; if not, a relationship existed which was very close to that of bailor and bailee. '(Bailment) may be comprehensively defined as a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be. * * * The object of bailment may be as various as the transactions of men.' 8 C.J.S. Bailments 1, pp. 222, 225.
 
 
 39
 F. H. Vahlsing, Inc. v. Hartford Fire Ins. Co., Tex.Civ.App.1937, 108 S.W.2d 947, is analogous to Pullman. The lessee of premises leased from a railroad had agreed to be responsible for loss by fire to cars placed upon a siding adjoining the leased premises by the railroad for the use and benefit of the lessee. Some cars were destroyed by fire, and an insurance company paid the railroad for its loss. The court held that the insurer was entitled to be subrogated to the rights of the lessor railroad against the lessee on the latter's agreement to be responsible for the loss.[6]
 
 
 40
 A similar result was reached in a case involving subrogation to a statutory rather than a contractual right of the insured. In United States v. American Tobacco Co., 1897, 166 U.S. 468, 17 S.Ct. 619, 41 L.Ed. 1081, the owner of tobacco tax stamps destroyed by fire was allowed to recover the value thereof from the Commissioner of Internal Revenue under a statute giving it that right, notwithstanding that the owner had been paid the loss by insurance companies and the action was brought for the use and benefit of the insurers.
 
 
 41
 The relationship created between the lessor and lessee of real property is closely analogous to that created by the bailment of personal property. 'The word 'lease,' when applied to personal property, has been held properly to result in the relation of bailor and bailee * * *' 8 C.J.S. Bailments 2, p. 226. Upon payment of a loss to a lessor, insurers of leased property are ordinarily subrogated to the lessor's rights against a lessee who has contracted to keep the property in good repair or to indemnify the lessor for loss or damage.[7]
 
 
 42
 Cases involving a vendor-vendee relationship are distinguishable. These cases with respect to both real and personal property were reviewed in In Re Future Manufacturing Cooperative, N.D.Cal.1958, 165 F.Supp. 111, 114,[8] the court concluding that a substantial majority of the jurisdictions give the vendee the benefit of the vendor's insurance rather than subrogate the insurer to the vendor's right to recover the purchase price from the vendee. Judge Goodman, who wrote the opinion in the Future case, relied upon that case in support of his denial of the right of subrogation to Atlantic. National relies on that case here. Judge Goodman recognized in Future, however, that with respect to other types of collateral rights, 'the courts have generally favored giving the insurer a right of subrogation.' On this point he said:
 
 
 43
 'Thus the prevailing rule is that an insurer upon indemnifying an insured mortgagee for the loss of his interest in destroyed mortgaged property is entitled to be subrogated to the mortgagee's right to enforce payment of the morgagor's debt. Shippers' insurers, upon payment for goods lost or damaged in transit, have usually been subrogated to the shippers' contractual rights against the carrier. Insurers of leased property, upon paying the lessor for loss or damage to the property, are ordinarily subrogated to his rights against a lessee who has contracted to keep the property in good repair or to indemnify the lessor for loss or damage.' 165 F.Supp. at 113.[9]
 
 
 44
 Cooney's agreement to accept full liability as an insurer for the Exchange property entrusted to its care and custody brings the instant case within the ambit of the rules permitting subrogation.
 
 
 45
 National also relies upon cases holding that an insurer under a bond indemnifying an employer against defalcations of an employee may not recover by way of subrogation from the employer's bank for a loss sustained by the employer and paid by the bank, arising from the bank's payment of checks forged by the employee.[10] However, in one of these cases, American Surety Co. v. Bank of California, 9 Cir., 1943, 133 F.2d 160, 164, this court recognized that this rule has no application where the third party has accepted primary liability by agreement. In distinguishing Chicago, St. Louis, etc. R. Co. v. Pullman, supra, the court said in part:
 
 
 46
 'In the case at bar there was no express contract on the part of Bank in favor of Interior as there was on the part of the railroad in the Pullman case. Furthermore, there was no primary liability on the part of a third person, the bank, for the loss; the primary liability rested on the employee Crowe. Therefore, the Pullman case is not authority in favor of Insurers herein.'
 
 
 47
 Here Cooney accepted primary liability by written agreement, bringing this case within the rule of Pullman rather than the suretyship rule followed in American Surety Co. v. Bank of California.
 
 
 48
 National contends further that as between Atlantic and Cooney, the equities preponderate in favor of Cooney. The trial court so found. It is true that subrogation is an equitable doctrine, and in the suretyship and vendor-vendee cases the courts have relied upon equitable considerations in denying subrogation.[11]
 
 
 49
 This is not a transaction, however, where liability would be imposed upon Cooney by operation of law, as in the bank-surety and vendor-vendee cases. Cooney expressly contracted to indemnify Exchange against loss. Nor was this gratuitous. Cooney anticipated and realized a large amount of business from Exchange. The premium paid Atlantic by Exchange was based upon the loss experience, so that the assumption of liability by Cooney as bailee (in the event of recovery) would affect the amount of premium to be paid by Exchange. Under these circumstances the liability is determined by Cooney's express contract to assume primary responsibility for the loss of goods of Exchange.
 
 
 50
 Moreover, Cooney insured his liability with National. If the trial court is affirmed on phase I, National will bear Cooney's loss to the amount of National's policy, and to that extent the equities asserted would be those of National rather than Cooney. No contention has been made that in such a case the equities favor National.
 
 
 51
 National contends that in any event Atlantic is not entitled to subrogation because in paying the loss it was a volunteer. Under paragraph 30(c) of the Atlantic policy, Exchange warranted that Atlantic would be free from liability 'for loss or damage to goods in the possession of any carrier or other bailee who may be liable therefor'. Nevertheless, Atlantic agreed to pay 'the difference between the amount which would be a claim under this policy if it did not contain this warranty and the amount recoverable' by Exchange 'from such carrier or bailee'. Pending collection from the bailee, the amount would be advanced as a loan, repayable only to the extent of any recovery from the bailee.
 
 
 52
 While the amount of Atlantic's liability for loss at the Cooney warehouse was limited to $100,000, at other locations the limitation under the same policy was in excess of $3,000,000, and there was evidence that Atlantic, upon request, would have increased the limits at the Cooney warehouse.
 
 
 53
 With respect to the first $100,000, National's contention that Atlantic was a volunteer clearly is without merit. There is more question regarding the payments in excess of $100,000, but even as to the these payments it is our conclusion that under the circumstances Atlantic was not a volunteer.
 
 
 54
 Cooney was liable to Exchange for the full amount of the loss. Whether Atlantic paid the loss to Exchange outright or as a loan would not concern Cooney. His liability under his contract was not in any way increased. It may well be, as National contends, that in making the payment Atlantic was promoting its own business interests with a valuable and substantial insurance client. But it was not a mere officious volunteer. It could properly take the position that it had at least a moral obligation to Exchange to pay the loss.
 
 
 55
 Under these circumstances it is our conclusion that under the California law Atlantic may not be deemed a 'volunteer' and lose its right to subrogation. In the case of Employers Mut. Liability Ins. Co. of Wisconsin v. Pacific Ind. Co., 1959, 167 Cal.App.2d 369, 334 P.2d 658, plaintiff insurance company participated in a compromise settlement with an injured employee although its policy did not cover the accident and hence it was not required to contribute to the settlement. Notwithstanding this fact it was held that the plaintiff could claim subrogation to the insured's rights against the defendant insurer under the latter's policy which covered the accident. The court said:
 
 
 56
 'Additionally, plaintiff (motor vehicle insurer) was under a moral obligation to protect Atkinson (the insured) since Atkinson in getting insurance from both companies (plaintiff and defendant) had attempted to get, and thought it had, sufficient coverage to be fully protected. If plaintiff had followed defendant's course of conduct, Atkinson would have been thrown on its own resources although it had paid premiums for protection. Moreover, plaintiff in making the payment acted on the invitation and at the request of Atkinson. To leave Atkinson unprotected would have injured the very valuable business relationship between Atkinson and plaintiff and likewise would have injured the insurance business generally.' 334 P.2d at 662, 663.
 
 
 57
 The court continued: 'Payment of the debt of another under a moral obligation will support equitable subrogation; and the remedy will be applied in all cases where demanded by the dictates of equity, good conscience, and public policy.' Id. at 664. This rule was followed in a different context by the Supreme Court of California, sitting in bank, in the recent case of Continental Casualty Company, et al. v. Zurich Insurance Company, et al., decided November 27, 1961, where the court quoted with approval from Employers, etc. Ins. Co. v. Pacific Ind. Co.
 
 
 58
 Having determined that Cooney is liable to Atlantic, we turn now to phase I of the case to consider whether, as found by the trial court, National is also liable to Atlantic under the policy National wrote for Cooney.
 
 
 59
 While 12 specifications of error are urged by National, they relate to four contentions: (1) the alleged breach by Cooney of the policy provision relating to settlement and compromise; (2) the alleged breach of the policy provision relating to concealment; (3) that the Atlantic policy constituted 'other insurance' within the meaning of the National policy; and (4) that the provision of the judgment is ambiguous and probably erroneous with respect to 'interest.'
 
 
 60
 In considering all of National's contentions with respect to the construction of its policy provisions, we have in mind the well established rules of construction that a 'contract of insurance (is to be) most strongly construed against the insurer if such construction is fairly reasonable' and should be 'given such construction as will fairly carry out its object by securing indemnity to the insured for the losses to which the insurance relates * * *'.[12]
 
 
 61
 In its first contention National relies upon the concluding sentence of clause 14 of its policy reading, 'This Company is not liable for any loss or damage, which, without its consent, has been settled or compromised by the Assured'.[13] National contends that the execution of the agreement of October 30, 1953, between Cooney and Exchange was a breach of this policy provision.
 
 
 62
 The agreement of October 30, 1953, executed two weeks after the fire, provides in pertinent part:
 
 
 63
 '1. (COONEY) acknowledges full liability as an insurer for the loss or damage resulting from the fire on the premises of (COONEY) on or about October 16, 1953, to the property of (EXCHANGE) * * * which was in the care, custody, or control of (COONEY) and agrees to reimburse (EXCHANGE) in full for such loss or damage as set forth hereinafter.'[14]
 
 
 64
 It will be noted that the title of clause 14 of the National policy is 'Impairment of Carrier's Liability'. Viewing this clause in its entirety (see footnote 13), it cannot be said that any rights of the assured (Cooney) to 'recover against any carrier, bailee or other party' was 'released, impaired or lost'. It would appear from a reading of the entire clause that the loss or damage referred to in the concluding sentence would be the assured's loss or damage against some other party which could not be settled or compromised. Assuming, however, that the sentence in question may be isolated from the remainder of the paragraph, did the October 30, 1953, agreement between Cooney and Exchange constitute a settlement or compromise in breach of this policy provision?
 
 
 65
 The trial court concluded that, 'The agreement of October 30, 1953, did not impose any new or additional obligation on Cooney and did not settle and compromise the loss and damage suffered by Exchange in the fire.' The court also found that, 'National did not suffer any prejudice by reason of the execution of the agreement * * *.'
 
 
 66
 It is apparent from a comparison of paragraph 7 of the agreement of August 15, 1952 (quoted supra) and paragraph 1 of the agreement of October 30, 1953, that the trial court was justified in concluding that the latter agreement did not impose any new or additional obligation on Cooney. The terms of the two agreements were practically identical, and the recital in the agreement of October 30, 1953, specifically referred to the provisions of paragraph 7 of the earlier agreement.
 
 
 67
 The trial court was also correct in finding that National did not suffer any prejudice by reason of the execution of the October 30, 1953, agreement. The liability of Cooney was determined solely by the agreement of August 15, 1952. The agreement of October 30, 1953, in no way increased that liability. Likewise, the liability of National was in no way increased or affected by the second agreement.
 
 
 68
 Is it necessary to show prejudice to defeat recovery by reason of Cooney's execution of the October 30, 1953, agreement? Neither party has cited any cases precisely in point. National relies upon cases where the assured voluntarily admitted liability which had not been established, in violation of policy provisions that the assured may not voluntarily admit liability or settle a claim.[15] Even in cases of this nature, it is ordinarily a question for the trier of facts to determine whether the insured did in fact 'voluntarily, or at all, assume any liability'.[16] Moreover, the California law is clear that before policy provisions relating to 'Notice to the Company' and 'Assistance and Cooperation' preclude 'a recovery under the policy by the insured, it must appear that the insurer has suffered prejudice'. Reed v. Pacific Indemnity Co., 1950, 101 Cal.App.2d 151, 225 P.2d 255, 261. While it is true, as National contends, that in most of the California cases holding that prejudice must be shown, the action was instituted by an injured party, the Reed case was a declaratory judgment action instituted by the insured.[17]
 
 
 69
 Since Cooney, in executing the October 30, 1953, agreement, did not assume any new or additional liability, falsely or otherwise, and National did not suffer any prejudice by reason of the execution of the agreement, the trial court correctly concluded that there was no breach of the policy provision relating to compromise and settlement.
 
 
 70
 National contends next that Cooney breached the concealment clause of the National policy by failing to disclose the terms of his agreement with Exchange. This clause provides: 'This policy shall be void if the Assured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof * * *'. Findings of the trial court bearing upon this contention may be summarized as follows:
 
 
 71
 (1) Cooney believed in good faith that even in the absence of any special agreement he had complete responsibility for all damage to the property of his customers, regardless of negligence, and was unaware that paragraph 7 of the August 15, 1952, agreement imposed any greater liability than would have been his without such agreement;
 
 
 72
 (2) Prior to the fire, Cooney never had any agreement with other customers whereby he agreed to assume special liability for loss or damage to goods;
 
 
 73
 (3) At no time prior to the fire did Cooney disclose to National that his liability to Exchange was greater than to other customers; but
 
 
 74
 (4) The agent of National who had handled Cooney's insurance for years and who wrote the policy in question knew that Cooney had entered into a contract for export packing with Exchange on August 15, 1952; and
 
 
 75
 (5) No inquiry was made by National prior to the fire with respect to the nature of Cooney's liability to Exchange under this agreement;
 
 
 76
 (6) Paragraph 7 of the August 15, 1952, agreement was material to the risk assumed by National;
 
 
 77
 (7) In failing to disclose the terms of his agreement with Exchange Cooney did not do so with the intent to defraud National;
 
 
 78
 (8) 'Cooney did not conceal from and/or misrepresent to National his contractual obligations to any of his customers, including Exchange, and Cooney was not guilty of any fraud';
 
 
 79
 (9) The liability assumed by Cooney in his agreement with Exchange was not an extraordinary or unusual liability and was not excluded from the coverage under the National policy.[18]
 
 
 80
 There is evidence to support all of these findings. Under this state of facts did Cooney's failure to disclose the terms of his agreement with Exchange constitute a 'concealment' under California law?[19]
 
 
 81
 National argues that the trial court, having made explicit findings that paragraph 7 of the Exchange agreement was material to the risk and that Cooney failed to disclose this provision of the agreement to National, the 'conclusion that it was a breach of the concealment clause of the policy under California laws inevitably follows'. If National's conclusion is correct, then there is a basic conflict between the findings upon which National relies and the equally explicit findings that Cooney did not conceal his contractual obligation to Exchange and was not guilty of any fraud, and that the contractual liability assumed by Cooney was not excluded from coverage under National's policy. The findings must be construed as a whole in the light of the evidence and applicable law in determining whether there was a breach of the concealment clause of the policy.
 
 
 82
 It is true that this court held in Merchants Fire Assurance Corporation v. Lattimore, 9 Cir., 1959, 263 F.2d 232, that under Section 332 of the Insurance Code of California the insured has a duty to communicate to the insurer facts which are material to the contract.[20] Factually the Lattimore case is clearly distinguishable. A personal property floater provision of the policy afforded all risk coverage on unscheduled personal property. The assured had declared values under 5 of 15 categories of property listed in the declaration form in the total sum of $9,950. It was stipulated that the actual value of the property was $36,500. There was testimony that it was customary for insurers writing this type of coverage to require insurance in the amount of at least 80 per cent of the total value; that had Miss Lattimore declared the actual value the insurer would have required coverage of at least $29,500; and that there would have been an increase in the premium. In other words, there was an actual concealment by the insured and proof that the policy would not have been issued on the same terms had the material facts been disclosed.
 
 
 83
 More important, the insurer in the Lattimore case had no 'means of ascertaining' the material facts which were concealed. The insurer had made a specific request for a declaration of values, listing some 15 categories of property in the form submitted to the insured. Here the agent of the company knew of Cooney's contract with Exchange, but neither the agent nor any representative of the company made any inquiry concerning the terms of the agreement.[21] Nor was there any written application for the policy or declaration form which required this information. With knowledge that Cooney had entered into a contract with Exchange, National had the means of ascertaining any terms or conditions of that agreement which might be material to the risks assumed under its policy. In addition, there was no evidence that National would not have issued the policy or that it would have been issued on different terms had it known of the provisions of paragraph 7 of the Exchange agreement.
 
 
 84
 In Olson v. Standard Marine Ins. Co., 1952, 109 Cal.App.2d 130, 240 P.2d 379,[22] the court quoted with approval from Roberto v. Hartford Fire Ins. Co., 7 Cir. 1949, 177 F.2d 811, 814, as follows:
 
 
 85
 'We think the correct rule is that where, as here, the insurer fails to question the insured, the latter cannot be said to have concealed facts so as to void the policy unless they are facts which he knows, or which a reasonable man should have known, to be material to the risk and unless he does so for the purpose of obtaining insurance which could not have been obtained after a disclosure of such facts.'[23]
 
 
 86
 In American Mutual Liability Insurance Co. v. Goff, 9 Cir., 1960, 281 F.2d 689, this court recognized the rules followed in both Merchants Fire Assurance Corporation v. Lattimore and Olson v. Standard Marine Ins. Co. in affirming a declaratory judgment imposing liability under a professional liability insurance policy where it was contended that a physician in his application for insurance had concealed material facts in failing to disclose that he had been convicted of violations of the California Health and Safety Code and had lost his narcotics stamp. Following the rule set forth in California Ins. Code, section 334, supra, that materiality is to be determined '* * * not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due * * *', the court noted 'a complete absence in the record of any evidence showing that appellant by its 'attitude and practice' considered Dr. Ashley's conviction or loss of narcotics stamp material'. The opinion continued:
 
 
 87
 'Nor was any inquiry directed to these matters in appellant's own application; the failure to inquire into such facts in the first instance has been held to demonstrate a lack of interest in them, negativing their materiality. (Citing Olson v. Standard Marine Ins. Co., supra.) This lack of inquiry, coupled with appellant's failure to meet its burden by otherwise establishing materiality, compels the conclusion that the lower court did not err in finding that the defense of concealment was not sustained.'
 
 
 88
 In the instant case National's agent knew that Cooney had entered into an agreement with Exchange for the export packing of Exchange's property, but National made no inquiry regarding the terms of that agreement. Even though no inquiry was made, National would still be in a position to claim concealment if it were shown that Cooney, as a reasonable man, should have known that his assumed liability was material to the risk, or that he had concealed his assumption of liability for the purpose of obtaining insurance which could not have been obtained had the assumed liability been disclosed. But the trial court did not so find, and, on this record, it was not required to make such a finding.
 
 
 89
 Finally, National contends that the Atlantic policy constitutes 'other insurance' within the meaning of paragraph 11 of the National policy, providing that its insurance shall not cover to the extent of any other insurance 'by whomsoever effected, directly or indirectly, covering the same property and this Company shall be liable for loss or damage only for the excess value beyond the amount of such other insurance'.
 
 
 90
 The trial court found that, 'No carrier or bailee, including Cooney, is insured under the Atlantic policy * * *' and continued: 'The 'other insurance' clause of the National policy is effective only when Cooney is insured under another policy or other policies of insurance in addition to the National policy at the time of loss. Cooney was not insured under any other policy of insurance as respects this loss, other than the policy of National, at the time of the fire.'[24] whether the Atlantic policy was taken out by or insured Cooney; the only requirement is that the same property be insured by the two insurances'; and (2) that by reason of the provision in Atlantic's policy insuring Exchange 'for account of whom it may concern', Cooney was in fact insured under the Atlantic policy.
 
 
 91
 The National policy, entitled 'Transportation Policy', was issued to Cooney to cover 'shipments as described herein * * * on goods and merchandise, including packages * * *'. An endorsement, entitled 'Packer's Liability Form', provides that the policy 'covers the liability of the assured for loss or damage to the property of others (customers of the assured) in the care or custody of the assured for packing and/or forwarding, but excluding property owned by the assured'.
 
 
 92
 Atlantic's policy, entitled 'Marine Open Cargo Policy', insures Exchange 'for account of whom it may concern' to cover all shipments 'upon all lawful goods and/or merchandise * * *'. In clause 31(e) the policy is extended to include coverage 'while goods are temporarily detained on premises of export packing agents for preparation for overseas shipment * * *'. Clause 25, however, warrants that the policy 'shall not inure, directly or indirectly, to the benefit of any carrier or bailee'.[25]
 
 
 93
 It is obvious that the National policy is a liability policy insuring Cooney's liability as a bailee for the property of others; while Atlantic's policy is a property policy insuring Exchange's interest in its own property and that of others intended to be covered thereby.
 
 
 94
 Ordinarily to come within a prohibition against 'other insurance' the insurance must be on the same subject matter and interest therein, and cover the same risk.[26] Cases construing policies issued to the same insured covering the same or similar interests in property accordingly are distinguishable.[27] While the clause upon which National relies refers to 'property', it is clear from the insuring clause that it covers Cooney's liability for loss or damage to the property of others and is not fire insurance on the property itself.[28]
 
 
 95
 The only case which tends to support National's position is H. Warshow & Sons v. Standard Narine Ins. Co., S.D.N.Y.1939, 27 F.Supp. 974, which in substance was an action for the benefit of the insurance company which insured plaintiff's goods while in a finishing plant against the company which insured the finishing plant as to its own goods, wares and merchandise, and 'the property of others for which the Insured are (is) liable, and all other property in which they (it) may have any form of insurable interest, or for which they (it) may assume liability'. In affirming a directed verdict for the defendant the court said that 'it is appropriate again to refer to the fact that the essential circumstances constituting the bailee's breach of duty, which would necessarily kindle the obligation of the company indemnifying against loss arising therefrom, have not been brought to light'. On this basis, the case was distinguished by the same court in the subsequent case of Mill Factors Corporation v. Ming Toy Dyeing Co., S.D.N.Y.1941, 41 F.Supp. 467, where the bailee's insurer was held liable and was denied contribution from the insurer of the bailor.[29]
 
 
 96
 Viewing the Atlantic policy as a whole it cannot be said that the clause, 'For account of whom it may concern' provided coverage for Cooney. A policy containing this clause 'will cover the interest of the person for whom it was intended by the party who ordered it, although the particular person intended was not known'.[30] It is clear both from Exchange's agreement with Cooney and the provisions of the Atlantic policy, that the Atlantic policy was not intended to cover Cooney. In his agreement with Exchange Cooney expressly agreed 'to accept full liability as an insurer of the property of Exchange and the property of others for which Exchange may be liable * * *'. The Atlantic policy provides in clause 25 that 'this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee'; and in clause 30(C) that Atlantic shall be 'free from liability for loss of or damage to goods in the possession of any carrier or other bailee who may be liable therefor'. By reason of these contract and policy provisions, no extrinsic evidence was necessary to prove the intention of the parties. The trial court correctly found that Cooney was not insured under the Atlantic policy.
 
 
 97
 The trial court ordered that Cooney have judgment against National, and that National is 'liable to and for the benefit of Cooney * * * to pay all or any part of any judgment that may be entered in favor of Atlantic and against Cooney * * * to the limit of $100,000.00 with interest * * *'. National contends that this part of the judgment is ambiguous and should be clarified to provide that interest shall accrue from the date on which any judgment against National may be entered. Atlantic argues that the provision is clear, that interest is recoverable from the time the claim or loss should have been paid by the insurer, and that the extent of Cooney's liability was made certain 'at least as early as April 7, 1954, when Cooney filed a supplement to his proof of loss with National'.
 
 
 98
 In determining when interest shall begin, it is necessary first to scrutinize the provisions of National's policy. As noted supra, the insuring clause in the 'Packer's Liability Form' endorsement provides that the policy 'Covers the liability of (Cooney) for loss or damage to property of others' in Cooney's care or custody. The endorsement prescribing the limits of coverage reads: 'It is understood and agreed that this Company's limit of liability is increased to not more than One Hundred Thousand Dollars ($100,000.00) in any one casualty, either in case of partial or total loss, or salvage charges, or any other charges, or expenses, or all combined.' The policy contains no provisions with respect either to interest or the time of payment of any loss; nor does it provide that National shall defend any action instituted against Cooney.[31]
 
 
 99
 In support of its contention that interest should be allowed from April 7, 1954, Atlantic relies solely on cases involving fire insurance policies and fidelity bonds.[32] All are distinguishable. It is true of course that in an action on a fire insurance policy, interest is ordinarily allowed from the time when the loss is due and payable and the amount has been determined or is capable of being made certain by calculation.[33] As we have held infra, however, national's policy is a liability rather than a fire insurance policy.
 
 
 100
 As a general rule, in an action on a 'liability' policy, the insurer is liable for interest from the date judgment is entered against the insured. If the policy is one of 'indemnity', interest accrues from the date of payment.[34] Under certain circumstances, where a settlement is rightly made, interest may accrue from the date of payment by the insured.[35]
 
 
 101
 Here, however, no judgment has been entered aganinst the insured (Cooney) and he has made no payment. Moreover, there is no provision in the National policy for payment of interest. In Sampson v. Century Indemnity Co., 1937, 8 Cal.2d 476, 66 P.2d 434, the Supreme Court of California, in construing the provision of an automobile liability policy allowing interest from the entry of judgment said in pertinent part:
 
 
 102
 'Respecting the liability of the company to pay interest, the policy provides that the company shall pay all interest accruing during a certain specified time. Without such a provision in the policy, or one similar thereto, the company would not be liable for any interest whatever on the judgment. Tulare County Power Co. v. Pacific Surety Co., 43 Cal.App. 315, 327, 185 P. 399. Possibly it was for the purpose of avoiding the result reached in that case that the provision respecting the payment of interest by the company was inserted in the present policy.'
 
 
 103
 In addition, the limitation of $100,000.00 applies not only to payment of any loss, but also 'salvage cahrges, or any other cahrges, or expenses, or all combined'. Particularly in view of the absence of any provision for interest at any time, it is our conclusion that the allowance of interest must be limited to interest on the judgment entered against National.
 
 
 104
 The judgment entered on phase II of the trial is reversed, and the judgment entered on phase I is affirmed, with interest to run from entry of final judgment; and the cause is remanded for entry of judgment in accordance with this opinion.
 
 On Petition for Rehearing
 
 105
 PER CURIAM.
 
 
 106
 Appellees Robert J. Cooney and Antional Union Fire Insurance Company have filed a petition for a rehearing en banc, specifying six grounds therefor, which will be considered in order.
 
 
 107
 ( 1) Appellees contend that the court failed to consider the point that Cooney is entitled to be treated as an 'insurer' under California law and paragraph 30(A) of the Atlantic policy providing that 'in the event the interest insured is covered by other insurance the loss shall be recoverable under the several policies in the order of the date of their attachment * * *'. This provision, in our opinion, obviously refers only to insurance policies issued by other insurance companies.
 
 
 108
 ( 2) It is next contended that Atlantic should be barred because it did not follow the provision of paragraph 30(C) of its policy that pending collection from a carrier or bailee who might be liable therefor, Atlantic 'agrees to advance as a loan such amount which would be a claim under this policy if it did not contain this warranty, repayable only to the extent of any net recovery from such carrier or bailee'. This paragraph does not specifically refer to subrogation. If it may be construed as bearing upon subrogation, it simply enlarged the right of Atlantic to subrogate even though it merely made a 'loan' to its insured. Atlantic was not required to make any payment as a 'loan' in order to enforce its subrogation rights.
 
 
 109
 ( 3) It is appellees' principal contention that this court has failed to follow California law on the right of subrogation to contractual rights, relying upon Meyers v. Bank of America, 1938, 11 Cal.2d 92, 77 P.2d 1084, and Hughes v. Potomac Insurance Co., Cal.App., 1962, 18 Cal.R. 650. The Meyers case was distinguished in our opinion. Hughes also is distinguishable. It was there held that in an action by insureds to recover from their insurer for a loss sustained when the rear end of their lot fell into a creek, the insurer's liability was not affected by the fact that the damage caused by the landslide was repaired by a county flood control district without cost to the insureds, and that the windfall resulting from the 'gratuitous action' of the flood control district inured to the insured's benefit and did not relieve the insurer from liability under its policy.
 
 
 110
 Appellees argue that Hughes is contrary to Chicago, St. L. & N.O.R. Co. v. Pullman Southern Car Co., 139 U.S. 79, 83, 11 S.Ct. 420, 35 L.Ed. 97, 101, and F.H. Vahlsing, Inc. v. Hartford Fire Insurance Co., Tex.Civ.App., 108 S.W.2d 947, cited in our opinion. Pullman and Vahlsing, however, involved the precise question here presented, i.e., the right of an insurer to recover under its right of subrogation from a bailee of the insured on the bailee's express agreement to be responsible for the loss. Hughes and the cases therein cited involved the right of an insured to recover from the insurer where repairs are made by a third party. On this point there are two lines of authority, the so-called New York rule followed by the California court in Hughes and the so-called Wisconsin rule, rejected in Hughes. It is significant tht while Hughes expressly discussed the two lines of authority, no mention is made of either Pullman or Vahlsing, presumably because an entirely different question is involved in those cases. We find nothing in Hughes which may not be reconciled with the holding in Pullman and Vahlsing that either the insured (Exchange) or its insurer (Atlantic), by right of subrogation, may recover from a third party (Cooney) who has expressly assumed responsibility for the loss.
 
 
 111
 ( 4) We find no merit in appellees' fourth contention that under California law 'liability insurance must not be considered in a third party suit'. The liability insurer (National) was a party upon its own motion to intervene. The portion of the opinion to which exception is taken merely refers to the fact that National will bear Cooney's loss to the amount of National's policy and to that extent the equities asserted would be those of National rather than Cooney. Moreover, on the question of equities, Atlantic's obligation was one of indemnity only. That of Cooney was positive and unconditional.
 
 
 112
 ( 5) It is appellees' fifth contention that the lack of consideration for the policy agreement was not cured by performance, since there was no complete performance by either party. The action is to recover damages for Cooney's failure as bailee to return merchandise which it received from Exchange. Insofar as this obligation is concerned, Exchange had performed fully when it caused the merchandise to be delivered to Cooney for packing. If, and when, Cooney packed and redelivered he would become entitled to payment for his services. He became potentially liable for a failure to redeliver, however, as soon as he received the merchandise.
 
 
 113
 ( 6) Appellees contend finally that the court has not followed the California law with respect to integration of contracts, relying upon Hancock Oil Co. v. McClellan, 1955, 135 Cal.App.2d 667, 288 P.2d 39. The Hancock case is distinguishable. It was there held that since only one agreement was mentioned in the complaint and that agreement was in writing 'and is designated by both parties as the sole basis for their relationship', and since there was no other agreement between the parties, 'the construction of that instrument disposes of the issues'. Here the contract construed by the trial court specifically provided for the receipt and packing by Cooney of merchandise received 'pursuant to purchase orders to be issued' by Exchange.
 
 
 114
 Appellees have also filed their objection to Atlantic's cost bill on appeal, contending that each side should bear its own costs, in that National was partially successful in that it obtained a determination that interest does not run on its liability until judgment is entered below. We agree.
 
 
 115
 Appellees' petition for a rehearing is denied. Their objection to Atlantic's cost bill is sustanined, and each side will bear its own costs on appeal.
 
 
 
 [1]
 At some locations the limits of the policy were in excess of $3,000,000, and there was evidence that Atlantic would have inoceased the limits at the Cooney warehouse had Exchange requested an increase
 
 
 [2]
 The order permitting National to intervene provided that the issues raised by the pleadings in intervention should be determined in advance of the issues raised by Atlantic's complaint, and that if determined adversely to National, it would be permitted to file a responsive pleading to the complaint as a defendant 'in the same manner and with like offect as if named as an original party * * *'
 
 
 [3]
 Other California cases following this rule include Vitagraph v. Liberty Theaters Co., 1925, 197 Cal. 694, 242 P. 709, 712; J. A. Folger & Company v. Williamson, 1954, 129 Cal.App.2d 184, 276 P.2d 645, 647; Wilck v. Herbert, 1947, 78 Cal.App.2d 392, 178 P.2d 25, 34; Lyon v. Goss, 1942, 19 Cal.2d 659, 123 P.2d 11, 20; In re Turner's Estate, 1959, 171 Cal.App.2d 591, 341 P.2d 376, 380; Hunter v. Sparling, 1948, 87 Cal.App.2d 711, 197 P.2d 807, 815
 
 
 [4]
 See also Williston on Contracts 3rd Ed. 427 106; 17 C.J.S. Contracts 100c, p. 448; Bolander v. Godsil, 9 Cir. 1940, 116 F.2d 437, 439, 10 Alaska 19
 
 
 [5]
 See Rex Trailer Co. v. United States, 1956, 350 U.S. 148, 151, 76 S.Ct. 219, 100 L.Ed. 149, 154; Cotton v. United States, 11 How. 229, 13 L.Ed. 675, 676, where the court said in part: 'Although as a sovereign the United States may not be sued, yet as a corporation or a body politie they may bring suits to enforce their contracts and protect their property, in the state courts, or in their own tribunals administering the same laws.'
 
 
 [6]
 See also Lucas v. Garrett, 1947, 209 S.C. 521, 41 S.E.2d 212, 169 A.L.R. 660
 
 
 [4]
 See In Re Future Manufacturing Cooperative, N.D.Cal.1958, 165 F.Supp. 111, 113; The Container Co. v. United States, 1950, 90 F.Supp. 689, 116 Ct.Cl. 706; Continental Ins. Co. v. I. Bahcall, Inc., E.D.Wis.1941, 39 F.Supp. 315. It is recognized that where the subrogation paragraph of an insuance policy limits the right of subrogation to fire 'caused by the act or neglect of any person or corporation', this provision is exclusive and would not permit recovery where property is destroyed by unknown causes. Hardward Mut. Ins. Co. v. Dunwoody, 9 Cir., 1952, 194 F.2d 666. Atlantic's policy does not contain any limitation of this nature, and we do not construe paragraph 30(c) of the policy, quoted supra, as any limitation upon Atlantic's right of subrogation
 
 
 [8]
 Future was a review of a bankruptcy proceeding. The bankrupt, a vendee under a conditional sales contract, had failed to insure the equipment purchased, although it had agreed to do so. The court affirmed an order of the Referee reducing the vendor's claim for the purchase price by the salvage value of the equipment and the amount paid by the insurer to the vendor
 
 
 [9]
 Judge Goodman indicated that even in the case of a vendor-vendee relationship under a conditional sales contract an insurance company could become subrogated to the right of the vendor for the purchase price under the contract, merely 'by including a clause in the policy specifically subrogating it to the vendor's right to recover the purchase price from the vendee.' 165 F.Supp. at 116
 
 
 [10]
 Meyers v. Bank of America Nat. Trust & Savings Ass'n, 1938, 11 Cal.2d 92, 77 P.2d 1084; American Surety Co. v. Bank of California, 9 Cir., 1943, 133 F.2d 160; MeNeil Construction Company v. Livingston State Bank, D.Mont.1957, 160 F.Supp. 809, reversed on other grounds 9 Cir., 265 F.2d 308
 
 
 [11]
 See American Surety Co. v. Bank of California, supra; In Re Future Manufacturing Cooperative, supra; Meyers v. Bank of America Nat. Trust & Savings Ass'n supra; Longmaid, Some Recent Subrogation Problems in the Law of Suretyship and Insurance, 47 Harv.L.Rev. 976, 977 (1934)
 
 
 [12]
 Olson v. Standard Marine Ins. Co., 1952, 109 Cal.App.2d 130, 240 P.2d 379, 383. See also Continental Casualty Co. v. Phoenix Construction Co., 1956, S.Ct. of Cal. in bank, 46 Cal.2d 423, 296 P.2d 801, 809, and cases there cited
 
 
 [13]
 Clause 14, preceding the sentence upon which National relies, reads: '14. Impairment of Carrier's Liability. Any act or agreement by the Assured, prior or subsequent hereto, whereby any right of the Assured, in the event of loss or damage to recover the full value of, or amount of loss or damage to, any property insured hereunder, against any carrier, bailee or other party liable therefor, is released, impaired or lost, shall render this policy null and void, but the Insurer's right to retain or recover the premium shall not be affected. * * *'
 
 
 [14]
 The agreement recites the past relationship between the parties, the agreement of August 15, 1952, and the fire. Specifically it recites that 'under paragraph 7 (of the August 15, 1952, agreement, Cooney) is fully liable as an insurer of the property of (Exchange) * * * while such property is in the care, custody or control of (Cooney) and desires to reimburse (Exchange) in full for such loss', and that the parties 'desire to continue to do business under the provisions' of the August 15, 1952, agreement
 
 
 [15]
 All of the cases cited by National are distinguishable. In Koontz v. General Casualty Co. of America, 1931, 162 Wash. 77, 297 P. 1081, after a claim had been made by an injured party and liability denied by the insurer, the insured filed an 'admission of liability grossly in excess of the claim * * * submitted'. In Miller v. Jones, 1942, 140 Ohio St. 408, 45 N.E.2d 106, an action for malpractice, the insured 'over the objection and in disregard of the protests of the insurer confessed judgment for the full amount prayed for in the petition'. In Kindervater v. Motorists Casualty Ins. Co., 1938, 120 N.J.L. 373, 199 A. 606, two weeks after an automobile accident the insured filed a statement admitting liability. The text from Appleman cited by National reads: 'If the insured falsely assumes liability for the accident, in statements given to the injured person or his attorney, the insurer will be relieved of liability.' 8 Appleman, Insurance Law and Practice, 132, 4780
 
 
 [16]
 Porter v. Employers' Liability Assur. Corporation, 1940, 40 Cal.App.2d 502, 104 P.2d 1087, 1095
 
 
 [17]
 We fail to see where National is aided by this court's opinion in Western Casualty & Surety Co. v. Weimar, 9 Cir., 1938, 96 F.2d 635. Plaintiff, a guest in the assured's automobile, brought suit against the insurance company to enforce a judgment. The company defended on the grounds that the assured had voluntarily admitted liability for the accident and failed to cooperate. The court held that the question of whether the assured had voluntarily admitted liability was for the jury and that the burden was on the company to prove that it was 'materially harmed by lack of cooperation on the part of the assured'
 
 
 [18]
 See Findings 21 to 25, inclusive
 
 
 [19]
 The pertinent provisions of the Insurance Code of California relative to concealment read:
 '330. Neglect to communicate that which a party knows, and ought to communicate, is concealment.
 '332. Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining.
 '333. Neither party to a contract of insurance is bound to communicate information of the matters following, except in answer to the inquires of the other:
 
 
 [3]
 Those of which the other waives communication
 '334. Nateriality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries.'
 
 
 [20]
 The court said in part: 'Section 332 placed upon Miss Lattimore the duty to communicate material facts to appellant regardless of whether she or her broker believed them to be material. This is made clear by the disjunctive 'or' in the phrase of 332 reading '* * * which are or which he believes to be material to the contract * * *.'
 'Application of this alternative provision, which does not require belief as to materiality, is dependent upon whether the undisclosed facts as to value were in fact material to the contract. * * *'
 
 
 [21]
 The manager of National's Inland Narine Department who actually issued the policy inspected Cooney's premises before the policy was issued, but neither he nor the agent made any inquiry concerning Cooney's agreement with Exchange
 
 
 [22]
 Olson v. Standard Marine Ins. Co. was an action on an all-risk jewelry-fur floater policy. Both assureds failed to disclose the cancellation of prior policies, and one failed to disclose that she had operated a house of prostitution and the other that she had been a prostitute herself. The court held that it could not say as a matter of law that either assured 'concealed the facts in question or did so with the intent to defraud' the insurer
 
 
 [23]
 The case of General Accident, Fire & Life Assur. Corp. v. Industrial Accident Comm., 1925, 196 Cal. 179, 237 P. 33, 37, upon which National largely relies, is factually distinguishable from both Olson v. Standard Marine Ins. Co. and the instant case. In that case at the time the policy was issued the insured had suffered the loss for which he was making claim. The court properly held under those circumstances, he was obliged to disclose the loss, even though no specific inquiry was made, the court saying in part: 'Material facts intentionally concealed or false representations made in reference to them with intent to mislead the insurer is fraud, which, at his option avoids the policy; and, where it is provided that a concealment will warrant the rescission of a contract of insurance, rescission is not an exclusive remedy, * * * and the insurer may set up the concealment in an action on the policy.'
 
 
 [24]
 Finding 30
 
 
 [25]
 Clause 30(B) of the Atlantic policy reads: 'Warranted that any fire insurance granted herein shall be null and void to the extent of any fire insurance which the assured or any carrier or other bailee has, at the time of the fire, and which would attach if this policy had not been issued.'
 
 
 [26]
 45 C.J.S. Insurance 533b, p. 271 and cases there cited
 
 
 [27]
 See, for example, Gillies v. Michigan Millers Mut. Fire Ins. Co., 1950, 98 Cal.App.2d 743, 221 P.2d 272
 
 
 [28]
 This distinction is recognized in Lucas v. Garrett, 1947, 209 S.C. 521, 41 S.E.2d 212, 169 A.L.R. 660, and annotation 169 A.L.R. 666
 
 
 [29]
 The court also called attention to the fact that if the 'other insurance' clause in both policies were taken literally neither would afford coverage and that such a result clearly was never intended. Here, if Cooney were denied coverage under the National policy, clearly he would have no coverage in view of the provisions of his contract with Exchange and the policy issued by Atlantic
 
 
 [30]
 Hagan v. Scottish Union & National Ins. Co., 1902, 186 U.S. 423, 22 S.Ct. 862, 46 L.Ed. 1229; New Orleans & So. American S.S. Co. v. W.R. Grace & Co., 2 Cir. 1928, 26 F.2d 967, cert. denied 278 U.S. 636, 49 S.Ct. 33, 73 L.Ed. 552; Board of Education v. Winding Gulf Collieries, 4 Cir. 1945, 152 F.2d 382. 4 Appleman, Insurance Law and Practice, 193, 2341, states the applicable rule as follows: '* * * an insurance for the account of 'whom it may concern' includes only such interests as were intended to be insured at the time of executing the policy, and a person who claims that the parties to the contract intended to protect his interest will be required to prove it'
 
 
 [31]
 The judgment entered by the trial court provides that, 'National shall have judgment against Cooney that National is not required or obligated to defend the complaint herein on behalf of Cooney.'
 
 
 [32]
 Koyer v. Detroit Fire & Marine Ins. Co., 9 Cal.2d 336, 70 P.2d 927 (fire insurance); Chase v. National Indemnity Company, 129 Cal.App.2d 853, 278 P.2d 68 (fire insurance); Pacific Coast Adjustment Bureau v. Indemnity Ins. Co., 115 Cal.App. 583, 2 P.2d 218 (fidelity bond); Pellas v. Ocean Accident & Guarantee Corporation, 24 Cal.App.2d 528, 75 P.2d 635 (fidelity bond). Atlantic's reliance on these cases with respect to interest is hardly consistent with its position that the National policy is a liability and not a property policy
 
 
 [33]
 Moreover, the time of payment is usually flxed at a specified time after proof of loss is submitted. See discussion of interest on fire insurance policies in 46 C.J.S. Insurance 1393b, p. 697
 
 
 [34]
 See 8 Appleman, Insurance Law and Practice 365, 4899; 45 C.J.S. Insurance 930, p. 1050; 46 C.J.S. Insurance 1401, pp. 706, 707
 
 
 [35]
 In Oil Base v. Transport Indemnity Company, 1957, 148 Cal.App.2d 490, 306 P.2d 924, an insurer under an automobile liability policy denied liability. The insured settled a claim, and the court upheld its right to recover from the insurer. With respect to interest, the court held that the insurer's obligation to reimburse the insured attached when the insured made the payment which the insurer 'was obligated under its policy to make, and, the amount being certain, interest commenced to run from that date'