[Civ. No. 20789.   Second Dist., Div. Two.   Sept. 27, 1955.]

HANCOCK OIL COMPANY (a Corporation), Respondent,
v. G. W. McCLELLAN et al., Appellants.

Garber & Garber and Monta W. Shirley for Appellants.

McCutchen, Black, Harnagel & Greene, Lynn O. Hossom
and Havelock Fraser for Respondent.

MOORE, P. J.—Respondent sued on a book account for a
balance due for petroleum products sold and delivered to ap-
pellants prior to November 13, 1951.   It was awarded the
sum of $17,895.44.

A general denial was followed by a special defense pleaded
and now urged, to wit, that at the times of the sales "it was
the custom and usage in the petroleum industry . . . in con-
nection with the sale of petroleum products by refineries . . .

to distributors such as defendants, to allow and permit, by reason of the influence of temperature on the properties of petroleum products, a temperature correction and adjustment on all gasoline, to reduce the volumes thereof to the basis of 60 degrees Fahrenheit; and said custom and usage was in effect in the business relationship existing during said time between plaintiff and defendants . . . was general, long established and well known to plaintiff, and was incorporated in and became a part of the agreement for the sale and purchase of gasoline between plaintiff and defendants . . . between May 1, 1948 and November 30, 1951, plaintiff sold and delivered to the defendant'' gasoline, which at the time of delivery was of a temperature in excess of 60 degrees Fahrenheit, in such quantities that after making temperature corrections, 102,407 less gallons were delivered than were charged for by plaintiff. Appellants now contend that at the termination of the contract of distributorship, they were entitled to be credited with overcharges made during the three-and-a-half-year period of the contract against the balance allegedly due on their account.

The relationship of the parties began June 4, 1948, when by written contract respondent authorized appellants to distribute the products of respondent in a specified territory; such ''non-exclusive distributorship shall continue only so long as it shall be mutually satisfactory and it may be terminated at any time by either party upon seven days' written notice''; while acting as distributor for respondent, appellants will not distribute the petroleum products of any other company in said territory; prices and quantities and terms of payment therefor shall be at all times solely within the discretion of respondent and may be changed from time to time upon reasonable notice. ''. . . all prior negotiations and verbal understandings are of no further force or effect, but are merged in this letter agreement.'' Pursuant to such contract, respondent sold and delivered gasoline to appellants and regularly sent invoices showing number of gross gallons delivered. Each of them was promptly paid by appellants with knowledge that none of them included a ''temperature correction.'' Throughout the period of the contract, there was no deviation from such policy.

Appellants contend that the contract of distributorship was itself the contract of sale and that each delivery of gasoline was in pursuance of that contract; and that such contract did not specify that a gallon would be anything other than

what a gallon of gasoline is understood to be in the oil industry in Los Angeles County; that if respondent had intended to contract for an uncorrected gallon, it would have contracted against making an adjustment of the gallon as required by the custom and usage of the trade which could have meant only a corrected gallon.

The court found that the contract of distributorship was not a contract of sale of respondent's gasoline but that pursuant to the letter agreement for distributorship, numerous contracts of sale of gasoline were made. Where only one agreement is mentioned in a complaint sounding in contract and that agreement is in writing and is designated by both parties as the sole basis of their relationship, "the trial court was called upon to construe the written agreement according to its terms." (*Cash* v. *Blackett*, 87 Cal.App.2d 233, 236 [196 P.2d 585].) Since there was no agreement between the parties at bar other than that for the distributorship, the construction of that instrument disposes of the issues.

██ There is no salutary basis for the contention that the agreement for a distributorship* was ever a contract of sale.

---

*[Exhibit A.]  "June 4, 1948

"G. W. McClellan and Winifred McClellan
R. R. Felnagle and Ruth Felnagle
650 South Arroyo Parkway
Pasadena, California

"Gentlemen and Ladies:

"Pursuant to our recent understanding and effective as of June 14, 1948, you are hereby authorized to distribute the petroleum products of the Hancock Oil Company of California in the territory known and designated as the Pasadena area in the County of Los Angeles, State of California, and more particularly described as follows: . . .

"This non-exclusive distributorship shall continue only so long as it shall be mutually satisfactory and it may be terminated at any time by either party upon seven (7) days' written notice to the other party.

"It is agreed that you will not distribute or sell the petroleum products of any other company in said territory so long as you retain this distributorship.

"Nothing herein contained, or otherwise, shall be deemed to give you any title to, or property right or interest in, the distributorship of the petroleum products of The Hancock Oil Company of California in said territory, or in any part thereof, nor shall you have any right, title or interest in or to any lease, sublease or other similar agreements between The Hancock Oil Company of California and property owners or dealers within said territory.

"Prices and quantities of said products and the terms of payment therefor shall be at all times solely within our discretion and may be changed from time to time upon reasonable notice.

"This is intended as a letter agreement covering the entire understanding between us relative to this distributorship and all prior negotiations and verbal understandings are of no further force or effect, but are merged in this letter agreement. . . ."

It was clearly a designation of appellants as the salesmen of respondent's products for a specified period so long as they should comply with prescribed conditions and paid for the gasoline purchased. It did not require definite quantities to be sold; specified neither time, place nor manner of delivery. It was only a letter and contained no agreement as to price. It was, therefore, too uncertain to constitute a valid contract. ■ Because it is not mutually obligatory and reserves to respondent the right to terminate it at will, it is not enforceable and for that reason cannot be the basis for recovery. (*Charles Brown & Sons* v. *White Lunch Co.*, 92 Cal.App. 457, 461 [268 P. 490].)

■ Contention is made that the alleged contract comprehended a usage and custom in the oil industry among marketers and distributors of petroleum products automatically to allow temperature correction to distributors in volume sales of full load lots where title passed at the loading rack of the marketer. The court received and considered all the evidence offered as to the subsistence of such custom. But it found that there was no such universal custom; that "the policy of plaintiff in respect of all sales of gasoline to all of its distributors was to make no adjustment of volume of gasoline sold by reason of temperature for the purpose of computing price, and was to compute the price of gasoline sold solely upon the physical volume measurements of the fluid at the time of each delivery, without reference to the temperature of the gasoline at such time"; that prior to the contract of distributorship defendants were not aware that such policy was practiced by plaintiff; that prior to its first sale to defendants, it informed defendants that its policy was not to make an adjustment of the volume of gasoline sold by reason of temperature for the purpose of computing the price and that it would not allow any temperature correction of any gasoline sold to defendants, and plaintiff repeatedly advised defendants that its own policy would be adhered to and that temperature correction would not be allowed.

There is no question as to the sufficiency of the evidence to support such findings. Not only was it proved that during the period of over three years appellants paid the total amounts of the invoices of a noncorrected temperature basis, but it was proved also that appellants made no attempt to correct respondent's practice. Such findings will not be disturbed on appeal. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].) It was shown also that (1) during the period

of the agreement respondent constantly advised appellants that the practice of temperature correction was not being applied and (2) respondent's policy remained stabilized as to all its distributors. Thus, with full knowledge of respondent's practices with reference to making no temperature correction, by appellants' compliance therewith, they must be deemed to have accepted, and acted upon respondent's policy. (*Davis* v. *Jacoby*, 1 Cal.2d 370, 379 [34 P.2d 1026].)

*Higgins* v. *California Petroleum etc. Co.*, 120 Cal. 629 [52 P. 1080], is not authority for appellants' contention. There, the trade usage of the phrase "gross ton" was specifically used and the evidence showed that actually a "long ton" was intended and that both parties had acted accordingly. An entirely different situation is found here. The term "corrected gallon" is not found in the contract of distributorship or in any of the invoices. Although parol evidence was received, it was insufficient to overcome the evidence of respondent as to the meaning of "gallon" as used in the invoices.

Appellants contend that although they paid all their bills regularly for three-and-a-half years, their sporadic requests for temperature corrections were the equivalent of a continuous protest on their part and that, therefore, they waived no rights as to recovery of the so-called overcharge resulting from failure to make temperature correction. They even imply that they were coerced into paying respondent's price, although the agreement was terminable within seven days. Such contention is based upon the deduction that there was a shortage of gasoline, that it was difficult to obtain such fuel during the three-and-a-half-year period and they feared another supply would not be readily obtainable if they should refuse to buy from respondent. There was no evidence that appellants were compelled to pay respondent's prices, no duress, physical, moral or monetary was brought to bear. Neither did appellants introduce testimony to prove that any effort was made to purchase gasoline from another source. Statements were regularly forwarded to defendants who paid promptly in full. Such repeated voluntary payments of accounts rendered precludes a debtor from subsequently disputing the accuracy of discounts allowed or the correctness of the statements of his indebtedness. (*Texas Co.* v. *Todd*, 19 Cal.App.2d 174, 186 [64 P.2d 1180].) No enlightened trial court would be so naive as to believe that a distributor of petroleum products who has sold 14,000,000 gallons of gasoline during three-and-a-half years at a fair profit on every gallon, who was advised

monthly of his receipts and of the cost of the product—that such distributor has, after the expiration of such period, suddenly discovered that he has been cheated out of more than $17,000 by reason of the failure of his vendor to credit the distributor's account as provided by an alleged contract of sale.

Judgment affirmed.

McComb, J., and Fox, J., concurred.

A petition for a rehearing was denied October 27, 1955, and appellants' petition for a hearing by the Supreme Court was denied November 23, 1955.