JBL ENTERPRISES, INC., et al., Plaintiffs,

v.

JHIRMACK ENTERPRISES, INC., Defendant.

Al BOOTH, et al., Plaintiffs,

v.

JHIRMACK ENTERPRISES, INC., et al., Defendants.

Nos. C–78–1227–WWS, C–80–0249–WWS.

United States District Court, N. D. California.

July 9, 1981.

Kithas & Lamont, San Francisco, Cal., for JBL Enterprises, Inc., et al.

Hugh Latimer, Bergson, Borkland, Margolis & Adler, Washington, D. C., for Al Booth, et al.

Lukens, St. Peter & Cooper, Eugene C. Crew, Mark J. LeHocky, Broad, Khourie & Schulz, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

These cases are before the Court on defendants' motions for summary judgment.

Pursuant to Pretrial Order No. 1, the Court has heretofore held a separate trial on the issues of the relevant market and the market share of defendant Jhirmack Enterprises, Inc. ("Jhirmack"). The Court determined that for the purposes of these actions the relevant market comprises the sale of beauty products, including but not limited to shampoos and conditioners, to beauty salons and other professional outlets, which is the market in which plaintiffs competed. Defendant Jhirmack's share of that market ranged from 2.3% in 1976 to 4.2% in 1978. Its share of total manufacturers' shipments of beauty products for sale at retail was 0.3%. Plaintiffs contended, however, that the relevant market comprises the sale of shampoos and conditioners to consumers for home use. If that market were accepted, the court determined, it would include all retail sales, including drug and discount stores and other over-the-counter ("OTC") outlets, in addition to beauty salons and professional outlets. In that market, Jhirmack's share of shampoo sales was less than one percent and its share of conditioner sales about two percent. *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 509 F.Supp. 357, 366–69, 376 (N.D.Cal.1981).

The Court also determined that Jhirmack's requirement that each distributor order a specified quantity of a new product in his next regular order following the product's introduction constituted a tying arrangement but, because of Jhirmack's lack of market power, did not amount to a *per se* violation. Accordingly, the lawfulness of that arrangement must be tested, just as the customer and territorial restraints complained of here, under the rule of reason. (509 F.Supp. at 376–79)

Following the issuance of the Court's ruling, all defendants moved for summary judgment on all claims. Because the responses of plaintiffs in the JBL action and of plaintiffs in the Booth action raise different issues, the actions will be separately treated.

I. *The JBL Action*

This action was filed in 1978 by a group of Jhirmack distributors in Utah, Idaho and

Indiana. The amended complaint charged that beginning in 1974 Jhirmack (1) coerced plaintiffs into accepting unreasonable territory and customer restrictions precluding plaintiffs from discounting Jhirmack products by diverting them outside of the assigned channels of trade, i. e., distributing them to others than beauty salons and other professional outlets, and (2) fixed prices by eliminating discounting of its products thereby inhibiting its distributors from competing. In addition plaintiffs charged a tying violation: that as a condition of purchasing Jhirmack's products and using its tradenames and trademarks, plaintiffs were required to make one-time purchases of certain undesired products. (509 F.Supp. at 376) These plaintiffs also alleged that Jhirmack made fraudulent representations regarding the setting of quotas for the sale by distributors of Jhirmack's products.

## A. The Antitrust Claims

Defendants have moved to dismiss the antitrust claims principally on the ground that in view of Jhirmack's insignificant market share the evidence as a matter of law establishes that the alleged restraints could not have had the requisite adverse effect on competition in the relevant market. *See Gough v. Rossmoor Corp.,* 585 F.2d 381, 389 (9th Cir. 1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed. 494 (1979); *DeVoto v. Pacific Fidelity Life Ins. Co.,* 618 F.2d 1340 (9th Cir.) *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980).

The JBL plaintiffs make two arguments in response:

(1) That the restrictions imposed by Jhirmack had a substantial effect on competition;

(2) That Jhirmack combined with certain distributors in enforcing territory and customer restrictions to eliminate discounting, thus forming a resale price fixing scheme which was a *per se* violation of the antitrust laws.

### 1. Effect on Competition

The JBL plaintiffs contend, in substance, that although Jhirmack enjoyed less than 2% of the retail market for shampoos and conditioners, it possessed sufficient market power for its restrictions to have a substantial impact on competition because it faced no interbrand price competition in the sale of shampoos and conditioners to professional outlets. As they put it:

> Despite such small market share, Jhirmack possessed the market power to raise retail prices above the competitive price prevailing. (Memorandum, p. 19)

The "competitive level" of prices against which plaintiffs measure Jhirmack's prices are the prices of similar products in OTC outlets. The argument is that Jhirmack shampoos and conditioners were sold at higher prices than other brands, even other salon brands, and that it was only when Jhirmack shampoos and conditioners were available at lower prices at drugstores and supermarkets, through diversion, that the salons' ability to sell Jhirmack products at a premium price was affected. Plaintiffs conclude that the only price competition faced by Jhirmack products at retail was intrabrand competition.

In support of these conclusions plaintiffs refer in kaleidoscopic fashion to facts showing the following:

(1) The prices of shampoos and conditioners sold in salons have been higher as a group than the prices of those sold in OTC outlets, both at wholesale and at retail.

(2) In the period extending through 1979, Jhirmack products were sold in salons at prices substantially higher than the prices at which diverted Jhirmack products were sold in OTC outlets.

(3) Through 1979, Jhirmack tended to set its suggested salon retail prices somewhat higher than those of two of its competitors, Redken and KMS.

Plaintiffs' argument is fallacious. That salon brands may sell at higher prices than OTC products and that Jhirmack products sold in salons may, due to a strong consumer preference, command higher prices than

certain other shampoos and conditioners and Jhirmack products sold at OTC outlets does not prove the absence of interbrand price competition, let alone that Jhirmack has any power to raise prices in the market for shampoo and conditioner.

The prices at which a product sells is a function of supply and demand. That a product is sold at a higher price than other functionally interchangeable products is a reflection of the value the market attaches to that product when sold in a particular volume—it is not probative of the absence of price competition or of power to control price in the market. Every manufacturer of course possesses power over the price at which he sells his products but that is not the power with which the antitrust laws are concerned.

Based on the evidence at the earlier trial, the Court previously found that shampoos and conditioners were functionally interchangeable, that the salon market was not a distinct submarket, and that price competition and price sensitivity exists across the entire retail market for shampoos and conditioners. (509 F.Supp. at 375) In the light of those findings, and the record as a whole, no jury could reasonably find that Jhirmack is subject only to intrabrand competition and possesses significant market power. *See Ron Tonkin Gran Turismo v. Fiat Distributors*, 637 F.2d 1376, 1388 (9th Cir. 1981). Based on this record, the restrictions complained of must be held as a matter of law not to constitute an unreasonable restraint of trade.

### 2. Vertical Price Fixing

■ The JBL plaintiffs also assert a vertical price fixing claim cognizable as a *per se* violation. In substance, the argument is that by controlling diversion to discounting wholesalers and retailers, Jhirmack stabilized and maintained resale prices.

The evidence shows that Jhirmack took steps to prevent diversion of its products, frequently at the instance of its distributors

who complained when products appeared in other stores at discount prices. There is no evidence, however, that Jhirmack fixed the resale prices for its products or enforced compliance with a particular price schedule.[1]

Plaintiffs' argument is premised on *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944), and *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). In *Bausch & Lomb* the defendant Soft-Lite Lens Company, Inc., which distributed lenses specially manufactured for it by Bausch & Lomb, required its distributors to charge published list prices and its retailers to sell at the prevailing local prices. An elaborate system of control and surveillance was used to enforce adherence to this price-fixing scheme. This price-fixing conduct was held to constitute a *per se* violation. The *Schwinn* case held vertical territory and customer restraints upon the sale by distributors of goods purchased by them from Schwinn to be a *per se* violation. That holding was overruled in *Continental T. V. Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568 (1977), a case plaintiffs did not feel it necessary to cite in this connection.

The undisputed facts show that the restrictions in the JBL case were non-price restrictions. Jhirmack did not establish or enforce resale prices. Price and nonprice restrictions may reflect the same motivation on the part of a manufacturer, but they generate entirely different economic consequences. Restrictions on price have a tendency to reduce price competition, interbrand as well as intrabrand. Restrictions on customers and territory tend to restrict intrabrand competition only and have the potential of strengthening interbrand competition. This reasoning led the Court in *GTE Sylvania* to overrule *Schwinn* and reinstate the rule of reason as the standard

---

1. Plaintiffs' claim of resale price maintenance has heretofore been dismissed. Moreover, at the prior hearing, counsel represented that no claim of a price-fixing agreement was being made. (Tr. 1137)

governing nonprice vertical restrictions.[2] Plaintiffs' contention is wholly without merit and must be rejected.

### B. *The Fraud Claim*

■ Plaintiffs contend that Jhirmack made fraudulent or negligent misrepresentations in connection with the setting of minimum purchase quotas. The distributor agreement provided that distributors were required to purchase a minimum quantity of products each month, the amounts being subject to change from time to time by Jhirmack. Appendix C to the agreement sets forth the agreed minimum quantities and the agreement states that the distributor "acknowledges that the minimum purchase requirements provided herein are fair, just and reasonable." Plaintiffs contend that the latter statement amounts to a fraudulent representation by Jhirmack on the theory that the specified quotas were a representation as to the minimum revenues that distributors could anticipate.[3]

It is doubtful that quotas incorporated into a distributors agreement afford a basis for a later fraud claim based on the distributor's failure to attain them. It is not necessary to reach that issue here, however, inasmuch as plaintiffs' showing is in any event fatally defective. Plaintiffs have failed to present facts on two essential elements: that Jhirmack made any representations negligently or with intent to defraud, *see Kelly Tire Service, Inc. v. Kelly Springfield Tire Co.*, 338 F.2d 248, 253 (8th Cir. 1964); and that plaintiffs acted in reliance on the alleged representations.

Accordingly, Jhirmack is entitled to summary judgment on the fraud claim.

### II. *The Booth Action*

The Booth action was filed in February 1980, shortly after plaintiffs' distributor agreements had been terminated. The precipitating cause of the termination was plaintiffs' refusal to execute new distributor agreements with Jhirmack. The new form of agreement had been tendered by Jhirmack to its distributors after it had entered into an agreement with International Playtex, Inc. ("Playtex"), appointing Playtex as the exclusive distributor of Jhirmack products to drug stores and other OTC outlets.

The Booth complaint contains 49 pages of rambling and often obscure recitals of numerous grievances, cast mostly in argumentative and conclusory language. It is difficult to discern a cognizable antitrust violation or other cause of action.[4] The gravamen of the complaint, however, appears to be the charge that Jhirmack and Playtex entered into a conspiracy to terminate plaintiffs in order to enable Playtex to sell Jhirmack products to OTC outlets, thereby depriving plaintiffs of the exclusive territories granted under the distributor agreements. (Complaint pp. 5–7) In addition, these plaintiffs assert certain related tort and contract claims under state law.

In its prior ruling, the Court observed that the charges made by the Booth plaintiffs did not appear to set forth injury of the type the antitrust laws were intended to prevent. That observation was based not only on the complaint but on the argument of Booth's counsel at trial to the effect that the violation consisted of the destruction of the distributors' exclusive distribution of Jhirmack products by the entry of Playtex as a distributor to the OTC market. (509 F.Supp. at 365–66)

Following issuance of the Court's ruling on the market issues and defendants' motions for summary judgment, these plaintiffs in their response for the first time asserted a *per se* price fixing violation.

---

**2.** *See* 433 U.S. at 51–58, notes 18 and 19, 97 S.Ct. at 2558–2561.

**3.** *See* second amended complaint, para. VIII, IX.

**4.** At oral argument counsel for these plaintiffs advised that the only claims now being assert-

ed by them were a horizontal price fixing claim under federal and state antitrust laws, a claim against Jhirmack for breach of the distributor agreement and breach of a covenant of good faith, and a claim against Playtex for inducing breach of contract.

## A. *The Antitrust Claim*

The argument which these plaintiffs now advance in opposition to defendants' motions for summary judgment is that the Jhirmack-Playtex agreement is a *per se* violation of Section 1 because it is designed to prevent distributors such as plaintiffs from engaging in price competition in the OTC market. The argument goes that Booth was ready, willing and able to enter the OTC market, that the new agreement with Playtex assigned the OTC territory exclusively to Playtex, that Booth's old distributor agreement was terminated when Booth was unwilling to sign a new agreement recognizing Playtex as the exclusive OTC distributor, and that these actions were "price motivated" in that they were intended to protect Playtex against price competition.

Viewing the evidence in the light most favorable to plaintiffs, it shows that Playtex secured the exclusive right to distribute to the OTC market, that it was concerned about the effect of diversion by distributors on its volume and the prices it could charge, and that it sought to have Jhirmack stop such diversion. Playtex's strategy was to price its products at relatively high levels compared to other OTC prices and it was concerned that diverting distributors could undersell it.

The Supreme Court has stated that the *per se* rule applies only to "certain agreements or practices" which are

> so "plainly anticompetitive," *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692 [98 S.Ct. 1355, 1365, 55 L.Ed.2d 637] (1978); *Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 50 [97 S.Ct. 2549, 2557, 53 L.Ed.2d 568] (1977), and so often "lack . . . any redeeming virtue," *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5 [78 S.Ct. 514, 518, 2 L.Ed.2d 545] (1958), that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases.

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). This is the standard governing the analysis of the Booth plaintiffs' claim of a *per se* violation based on an alleged conspiracy to restrain price competition.

The Court in *Broadcast Music* also cautioned against automatic application of the *per se* rule to any practice that may relate to or affect price.

More generally, in characterizing this conduct under the *per se* rule, our inquiry must focus on whether the effect and, here because it tends to show effect, see *United States v. United States Gypsum Co.,* 438 U.S. 422, 436 n. 13 [98 S.Ct. 2864, 2873, 57 L.Ed.2d 584] (1978), the purpose of the practice are to threaten the proper operation of our predominantly free-market economy—that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to "increase economic efficiency and render markets more, rather than less, competitive." *Id.,* at 441 n. 16 [98 S.Ct. at 2875]; see *National Society of Professional Engineers v. United States,* 435 U.S. at 688 [98 S.Ct. at 1363]; *Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S., at 50 n. 16 [97 S.Ct. at 2557]; *Northern Pac. R. Co. v. United States,* 356 U.S., at 4 [78 S.Ct., at 517].

\* \* \* \* \* \*

Finally, we have some doubt—enough to counsel against application of the *per se* rule—about the extent to which this practice threatens the "central nervous system of the economy," *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 226 n. 59 [60 S.Ct. 811, 846, 84 L.Ed. 1129] (1940), that is, competitive pricing as the free market's means of allocating resources. Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints. Mergers among competitors eliminate competition, including price competition, but they are not *per se* illegal, and many of them withstand attack under any existing antitrust standard.

Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.

441 U.S. at 19–20, 23, 99 S.Ct. at 1562–1564.

The recent decision in *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376 (9th Cir. 1981), affirming summary judgment for defendant, applies this reasoning to a closely analogous case. Plaintiff, a foreign car dealer, complained that defendant, a distributor of Fiat automobiles, had refused to appoint plaintiff as a Fiat dealer pursuant to an agreement with the existing Fiat dealer in the area. Because Fiat's share of the relevant market was insignificant, the issue was whether defendants' conduct could be held to be illegal *per se*. The lower court had determined that Fiat's share of total automobile registrations in the area was less than 2% and that its share of the foreign car market did not exceed 5.2%. 637 F.2d at 1379.

The court observed that no evidence had been offered to contradict the finding that the product market was characterized by vigorous interbrand competition which would not be affected by a failure to increase intrabrand competition for a product with a very small market share. 637 F.2d at 1387. The Court also observed that "an important factor" in defendant's decision not to appoint plaintiff as an additional dealer was "its desire to stimulate [an existing distributor's] sales, i. e., its desire to promote interbrand competition." Noting that the antitrust laws are primarily concerned with interbrand competition, and that the failure to increase intrabrand competition by failing to appoint plaintiff a dealer in the circumstances presented not only "was not necessarily pernicious" but

had the potential of benefitting competition by increasing the sales of defendants, the court determined that application of the *per se* rule would be unjustified. 637 F.2d at 1387–88.

The reasoning of the court of appeals is applicable here. As heretofore discussed, Jhirmack's share of the relevant market is too insignificant for any restraint on intrabrand competition to have a substantially adverse effect on interbrand competition. *See Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d 620, 627 (9th Cir. 1977). For plaintiffs to recover, therefore, they must come forward with evidence to show that "the challenged conduct clearly had, or was likely to have, a pernicious effect on competition and lacked any redeeming virtue." *Ron Tonkin*, 637 F.2d at 1387.

The "conspiracy" under attack here is the October 1979 agreement between Jhirmack and Playtex appointing Playtex the exclusive distributor of Jhirmack products to OTC and other non-professional outlets. Jhirmack's products had not theretofore been officially distributed to OTC outlets, having been generally limited to professional outlets except for sporadic diversion.

The primary effect of the Jhirmack-Playtex agreement on competition in OTC channels was to add the competitive activity of a major distributor and to increase the amount of Jhirmack products available to consumers in OTC outlets. On its face, therefore, the agreement thus stood to enlarge trade and augment competition with other brands of beauty products. Moreover, the agreement also provided a new source of intrabrand competition for Jhirmack products sold in salons.[5] Indeed, it was the threat of new competition from

---

5. Another factor considered by the court in *Ron Tonkin* was the motivation behind the challenged conduct. Regarding the negotiation of the Jhirmack-Playtex agreement, Playtex General Counsel Joel Coleman testified, "I knew that getting an exclusive right to sell to the OTC trade was essential to us ... [the effect of the agreement was to] grant Playtex the rights that it needed." (Dep. of July 25, 1980) Playtex evidently considered the restric-

tion complained of necessary to achieve the procompetitive results envisioned. As the court said in *Ron Tonkin*, 637 F.2d at 1387, "The courts have recognized the benefit to encouraging the promotion of interbrand competition which occurs by allowing a business to distribute its products in a particular fashion," citing *GTE Sylvania*, 433 U.S. at 54, 97 S.Ct. at 2559.

OTC distribution of Jhirmack products which motivated the Booth plaintiffs to file this action.[6]

Defendants have demonstrated that the challenged agreement was likely to promote both interbrand competition and one kind of intrabrand competition. The only negative effect plaintiffs point to is that another potential kind of intrabrand competition (by their entry into the OTC market) was foreclosed. Even drawing all reasonable inferences in favor of plaintiffs, it cannot be said that they have presented significant probative evidence that the Jhirmack-Playtex agreement "clearly had, or was likely to have, a pernicious effect on competition and lacked any redeeming virtue." *Ron Tonkin*, 637 F.2d at 1387.

Plaintiffs seek to equate this case with *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979). There the plaintiff, a dealer in kitchen cabinets, was terminated by the manufacturer a few months after it had become a dealer following a complaint by a competing dealer to the manufacturer that plaintiff was discounting cabinets. On appeal from the trial court's grant of summary judgment for defendants, the court stated the issue to be

> whether the conduct at issue here—a manufacturer deliberately withdrawing its product from a distributor that resold it for a price less than its competitors at the request of a competitor—should be classified as a *per se* violation of the Act. Following Justice Black's formulation, the activity under consideration in this case must be seen to have a pernicious effect on competition without having any redeeming virtue. The pernicious effect is apparent: one competitor has succeeded in excluding another from dealing in United cabinets through a combination with United and its agent, and, in so doing, has eliminated the possibility of price competition by the foreclosed dealer.

595 F.2d at 166. *See Northern Pacific Railroad Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

The *Cernuto* court noted that the *per se* rule has not been applied to unilateral decisions by a manufacturer in "arranging its distribution structure," observing, as an example, that it is "[neither] uncommon . . . [nor] illegal for a manufacturer to enter into contracts that provide particular customers exclusive rights to sell the product in designated geographical areas." 595 F.2d at 167. The court found the conduct alleged in that case to be distinguishable from generally accepted manufacturers' practices in two ways: first, because the manufacturer allegedly did not act on its own to pursue its own marketing strategy to compete with other manufacturers, and second, because the conspiracy was alleged to be motivated by price considerations. The relevance of the first factor is that action taken by the manufacturer at the instance of its customers results in restraints primarily horizontal in nature, tending to suppress competition between its customers. The relevance of the second is that action having the purpose and effect of restraining price movement and the free play of market forces is illegal *per se*. 595 F.2d at 168–69. *See also Contractor Utility Sales v. Certain-Teed Products*, 638 F.2d 1061, 1072 (7th Cir. 1981).

As authority for application of a *per se* rule, *Cernuto* is distinguishable. First, the nature of the termination alleged here is different from that giving rise to the *per se* analysis in *Cernuto*. This is not a case of terminating a discounter. Plaintiffs do not allege that any of them sold at discounted prices or sold to OTC outlets at all, or that they had made any preparations to do so, or that they had been identified by defendants as likely discounters. What happened to plaintiffs did not happen because of anything they had done, in contrast to the facts alleged in *Cernuto*.

Nor were plaintiffs' distributorships simply taken away as in *Cernuto*. Plaintiffs were offered revised distributorship agreements confirming them as exclusive distributors to the customers they had. Plaintiffs

---

**6.** See 509 F.Supp. at 365–66, note 3; complaint pp. 6–7.

found these contracts substantially less ·desirable and refused to sign them. It was only after plaintiffs refused to sign that Jhirmack terminated them. Plaintiffs here faced a situation similar to that in *Contractor Utility Sales v. Certain-Teed Products*, 638 F.2d 1061, 1072–73 & n. 9 (7th Cir. 1981). There plaintiff argued that defendant's actions towards plaintiff during a certain period were "similar, in· terms of anticompetitive effects, to the termination of an existing dealer," and should receive the same *per se* analysis. The court, however, stated that while defendant's conduct "may have reduced [plaintiff's] sales volume and produced unacceptable anticompetitive effects," the absence of a "complete termination" precluded application of *per se* analysis based on the rule in *Cernuto*. The *per se* analysis in *Cernuto* is inappropriate here for the same reason.

Second, the termination here did not have the "pernicious" effect on competition as did the termination in *Cernuto*. There the net result of the termination was one less distributor and one less source of intrabrand price competition. In this case, as discussed above, the Jhirmack-Playtex agreement has substantial pro-competitive aspects and could not be called "pernicious." [7] Inasmuch as the antitrust claim asserted is limited to a *per se* violation, summary judgment must be granted.

**B.  *The Tort Claims***
### *Breach of Covenant of Good Faith and Fair Dealing*

■ Plaintiffs premise their claim ·for breach of a covenant of good faith and fair dealing on the assertion that "Jhirmack terminated plaintiffs for refusing to accede to its illegal agreement with Playtex." (Memo., p. 30). In light of the preceding disposition of plaintiffs' antitrust claim, this claim necessarily fails.

### *Inducing Breach of Contract*

■ Plaintiffs complain that Playtex tortiously induced Jhirmack to breach its contract with existing distributors in two ways: by appointing Playtex as an additional distributor, and by subsequently barring existing distributors from any part of the OTC trade. To recover on this claim plaintiffs must prove (1) that a valid contract existed; (2) that Playtex had knowledge of the contract and intended to induce its breach; (3) that the contract was in fact breached by Jhirmack; (4) that such breach was proximately caused by Playtex's unjustified and wrongful conduct; and (5) that as a result plaintiffs suffered damage. *Richardson v. La Rancherita La Jolla, Inc.*, 98 Cal.App.3d 73, 80, 159 Cal.Rptr. 285 (1980).

Plaintiffs' evidence is insufficient to withstand summary judgment on this claim. Defendants' uncontradicted evidence shows that Jhirmack made its decision to engage a new distributor for the OTC trade before Playtex knew of this plan. The alleged breach therefore could not have been proximately caused by Playtex. Defendants also show without contradiction that Playtex understood that the existing agreements limited existing distributors to salon customers and that appointing an OTC distributor therefore would not breach the existing distributor agreements. While the meaning of the contract itself presents a factual issue, as discussed below, defendants' evidence thus suffices to show that Playtex did not intend to procure its alleged breach. Defendants are accordingly entitled to summary judgment on this claim.

### C.  *The Contract Claim*

■ Plaintiffs claim that their distributor agreements granted them exclusive geographical territories and that Jhirmack breached the agreement when it appointed

---

7.  For the same reasons, other authorities cited by plaintiffs are inapposite. *See Alloy Int'l. Co. v. Hoover-NSK Bearing Co., Inc.*, 635 F.2d 1222 (7th Cir. 1980); *Girardi v. Gates Rubber Co. Sales Division, Inc.*, 325 F.2d 196 (9th Cir. 1963). *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), involved a conspiracy between an association of Chevrolet dealers and General Motors to force dealers to stop selling to discounters by policing their sales, forcing them to repurchase cars and threatening termination.

Playtex as its OTC distributor for the entire country in October 1979. The dispute centers on the following paragraph of the distributor agreement:

1. TERRITORY. PRODUCER hereby grants to the DISTRIBUTOR the exclusive and non-transferable license to market and to promote sales of PRODUCER'S products. DISTRIBUTOR shall be primarily responsible for selling PRODUCER'S products to beauty salons, the owners, operators, and apprentices; beauty schools, the owners, teachers and students; barber schools, the owners, teachers and students; men's hairstyling establishments; barber shops, the owners, barbers and apprentices, in and throughout the area described in Exhibit "A" attached hereto and incorporated herein by reference. (This area shall be hereinafter referred to as the "territory"). DISTRIBUTOR shall exclusively devote its entire time and use its best efforts to exploit, promote and sell PRODUCER'S products to said customers within the territory. The license granted to DISTRIBUTOR is an exclusive license in that the PRODUCER will not appoint another distributor within the territory.

Exhibit A attached to each agreement specifies a geographical area, such as "The entire state of Utah."

Defendants argue that the distributor agreement defined the distributors' territories to exclude the OTC market, so that in appointing Playtex as its OTC distributor Jhirmack did not violate the promise of exclusivity. In support of this argument, defendants refer to the language quoted above which specifies that the distributor is to "exclusively devote its entire time" to selling Jhirmack products to beauty salons and other customers in the professional salon trade. Defendants contend that the definition of territory contained in the agreement means merely that Jhirmack could not appoint another distributor to service the same class of professional customers in a given area.

In opposition, the Booth plaintiffs argue that the agreement's promise of exclusivity pertains to the entire geographical area described in Exhibit A of each agreement. Under this interpretation Jhirmack's appointment of a distributor like Playtex to service OTC outlets within those geographical areas would violate the agreement not to appoint another distributor in the territory, regardless of whether the agreement enabled the distributors themselves to sell to OTC outlets.

These conflicting interpretations of the exclusive territory clause raise factual issues requiring a trial on the contract claim.

■ Alternatively, defendants move for judgment on the contract claim on the ground that enforcement of the distributor agreement to prohibit sales of Jhirmack products to OTC outlets would be contrary to law and public policy. It is true that in the earlier trial in this case the Booth plaintiffs appeared to suggest such an interpretation of the agreement. Plaintiffs' present position, however, is that their agreement did not prohibit Jhirmack from marketing its products in OTC channels but merely required that if such marketing were to be undertaken, it would have to be through Jhirmack's existing distributors. So stated, the purpose of the agreement cannot be said to offend law or public policy.

■ Defendants further contend that the Booth plaintiffs' contract claim is barred by the limitations period contained in the distributor agreement. Section 9 of the agreement provides that "no actions . . . may be brought by Producer, or Distributor, against each other, arising out of or relating to this Agreement more than thirty (30) days after a cause of action occurs."

Plaintiffs argue, however, that the distributor agreement is a "contract for sale" within the meaning of California Commercial Code Section 2725, which provides that the parties to such a contract may not reduce the period of limitation to less than one year.[8] If plaintiffs are correct, the 30

8. California Commercial Code § 2725 provides in relevant part:

day limitation period contained in the contract is not enforceable. The issue turns, then, on the characterization of the distributor agreement.

According to Commercial Code Section 2106, the term "contract for sale" "includes both a present sale of goods and a contract to sell goods at a future time." Section 6 of the distributor agreement states that it "constitutes the entire understanding and agreement between the parties with respect to the sale of Producer's products." Section 2 provides that "[t]he Distributor shall purchase Producer's products . . . at prices scheduled on the Producer's price list," which "Producer, in its sole opinion, may change from time to time." A price list is attached as an exhibit to the agreement. Section 3 requires monthly minimum purchase requirements, set forth in detail in an exhibit appended to the agreement.

Thus the distributor agreement commits the distributor to purchasing minimum amounts of Jhirmack products within certain fixed periods, and defines the terms and conditions for those purchases. While the agreement contains terms not relating strictly to sales, its purpose and effect is clearly to provide for the sale of goods by Jhirmack to its distributors. The distributor agreement is therefore a contract to sell goods at a future time and hence a "contract for sale" within the meaning of Commercial Code §§ 2106 and 2725. *See Hachten v. Stewart*, 42 Cal.App.3d Supp. 1, 116 Cal.Rptr. 631 (1974) (gasoline dealer's contract); *Steiner v. Mobil Oil Corp.*, 20 Cal.3d 90, 98, 141 Cal.Rptr. 157, 569 P.2d 751 (1977) (gasoline dealer's contract); *Warner Motors, Inc. v. Chrysler Motors Corp.*, 5 U.C.C.Rep.Serv. 365 (E.D.Pa.1968) (automobile dealership agreement). Under §

2725, the 30 day limitation period provided in the contract is unenforceable, and does not bar plaintiffs' breach of contract claim.[9]

If at the trial it is found that Jhirmack breached its contract with plaintiffs by appointing Playtex as its OTC distributor in October 1979, the issue of the proper measure of damages will arise. The agreement entitled either party to terminate on 30 days' written notice. Jhirmack gave plaintiffs written notice of termination in December 1979, and plaintiffs do not contend that the notice of termination was not effective. Plaintiffs' damage claim would therefore be limited to lost profits during the period from the date of the alleged breach (October 1979) to the effective date of termination (January 1980).

### ORDER

1. Summary judgment is granted in favor of defendant Jhirmack Enterprises, Inc. in action C–78–1227, defendant to recover costs.

2. Summary judgment is granted in favor of defendants Redding, Schwartz, Playtex, Smilow, and Esmark and against plaintiffs on all claims in action C–80–0249, defendants to recover costs.

3. Summary judgment is granted in favor of defendant Jhirmack Enterprises, Inc. on all claims in action C–80–0249 except the claim for breach of contract.

4. Further proceedings will be governed by the following provisions:

a. The court will hold a pretrial conference on the remaining claim on Friday, August 28, 1981, at 3 p. m.

b. Plaintiffs in action C–80–0249 are directed to serve and file by August 21, 1981, their pretrial statement with re-

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

**9.** Jhirmack cites *Hancock Oil Co. v. McClellan*, 135 Cal.App.2d 667, 288 P.2d 39 (1955), which held a gasoline dealership contract not to be a "contract for sale." That case is distinguisha-

ble. First, as the case preceded the adoption of the Uniform Commercial Code in California, the court was not concerned with the definition of "contract for sale" in § 2106, nor does the opinion contain a cognate analysis. Second, the contract in that case defined the terms of future sales with much less precision than the contract here; the court found it "too uncertain to constitute a valid contract." 135 Cal.App.2d at 670, 288 P.2d 39.

spect to their contract claim, setting forth

i. The name of each witness to be called and a brief summary of the testimony to be given;

ii. A description of each exhibit to be offered;

iii. A detailed computation of the damages claimed, together with specific references to the source for each figure used in the computation.

iv. Any additional discovery required for trial.

c. Jhirmack shall serve and file by August 21, 1981, a pretrial statement with respect to any counterclaim it intends to take to trial, conforming to the preceding paragraph b.

d. Trial of all remaining claims will begin on September 21, 1981, at 9:30 a. m.

IT IS SO ORDERED.