JBL ENTERPRISES, INC., dba Jhirmack of Utah; Jean Robinson, dba Jhirmack of Idaho and Jhirmack of Boise; Lois Jean Million, dba Jhirmack of North Central Indiana, Plaintiffs-Appellants,

v.

JHIRMACK ENTERPRISES, INC., Defendant-Appellee.

Al BOOTH and Thelma R. Bean, individually; Jhirmack of Washington, D.C., Inc.; Walter R. Cecchini, Jr., individually; and Jhirmack of Southwestern Pennsylvania, Inc., Plaintiffs-Appellants,

v.

JHIRMACK ENTERPRISES, INC.; Irene Redding, Albert L. Schwartz, and Gary McCord, individually; International Playtex, Inc.; Joel E. Smilow, individually; and Esmark, Inc., Defendants-Appellees.

Nos. 82–4102, 82–4107.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 17, 1982.

Decided Feb. 8, 1983.

See also D.C., 509 F.Supp. 357.

John A. Kithas, Kithas & Lamont, San Francisco, Cal., Hugh Latimer, Bergson, Borkland, Margolis & Adler, Washington, D.C., for JBL.

Eugene Crew, Mark J. LeHocky, Khourie & Crew, San Francisco, Cal., for International Playtex.

William Lukens, Lukens, St. Peter & Cooper, San Francisco, Cal., for Jhirmack Enterprises.

Before MERRILL, DUNIWAY and FER-GUSON, Circuit Judges.

FERGUSON, Circuit Judge:

These appeals arose out of a common scenario. The plaintiffs in both actions are former distributors of defendant Jhirmack Enterprises, Inc. ("Jhirmack"). When their contractual relationships broke down, the disappointed parties sought solace (and treble damages) from the court, alleging various antitrust violations and related contract and tort claims. Following summary judg-ment in favor of the defendants, the plain-tiffs appeal. We affirm.

FACTS:

Jhirmack manufactures hair care and cos-metic products which are distributed throughout the United States by licensed distributors. The company was founded in 1968 by Jheri and Irene Redding. From 1972 to 1979 Jhirmack followed a marketing strategy of making its products available through beauty salons, barber shops, beauty schools, barber schools and hair styling es-tablishments (the "professional salon trade" or "PST") rather than through other types of outlets, such as drugstores, department stores and the like ("over-the-counter" or "OTC" outlets). Such a limited outlet strategy is often adopted by new firms who wish to avoid the large advertising costs necessary to break into the heavily competi-tive OTC market in hair care and beauty products. To this end Jhirmack contracted with several independent distributors, in-cluding the three *JBL* plaintiffs and the *Booth* plaintiffs, giving each an exclusive geographic territory and requiring each to "exclusively devote its entire time and use its best efforts to promote and sell" Jhir-mack's products to PST outlets in their respective territories. The contracts also provide that Jhirmack "will not appoint an-other distributor within the territory," and set minimum purchase quotas for each dis-tributor, based on Jhirmack's estimate of potential PST accounts within the assigned territory.

In 1976–77, Jhirmack received complaints from salon owners and distributors that its products were appearing in OTC outlets. Salons charge premium prices for products sold to their customers and prefer the pres-tige that flows from carrying products not generally available. It is difficult for PST outlets to maintain either prices or prestige if the product can be found in the local supermarket at a substantially lower price. Many PST outlets will therefore refuse to carry products that are generally available OTC. On receiving complaints Jhirmack took steps to determine which distributors

were "diverting" its products to OTC outlets and to discourage them from doing so.

In 1978, Jhirmack terminated the JBL distributors for refusing to follow Jhirmack's marketing plan and for failing to meet its order quotas for their respective territories. JBL filed suit, alleging that the terminations were the result of illegal territorial and customer restrictions, resale price maintenance and illegal tying arrangements in violation of federal antitrust law, and fraud or negligent misrepresentation in setting minimum purchase quotas.

By 1979, Jhirmack had developed sufficient name recognition to move into the OTC market. After negotiations with several companies, it entered an agreement with International Playtex, Inc. ("Playtex") in October, 1979. In exchange for the exclusive right to distribute Jhirmack shampoos and conditioners to OTC outlets, Playtex agreed to conduct a nationwide marketing campaign, pledging to spend seven million dollars the first year and fifteen percent of annual net sales in succeeding years promoting the products. The contract specifically excluded the professional salon trade, and Jhirmack continued to use independent distributors for its PST distribution.

In November 1979, Jhirmack sent new distributor agreements to its PST distributors, requiring them to recognize Playtex as the exclusive OTC distributor of Jhirmack shampoos and conditioners. Booth refused to sign the new agreement and so was terminated by Jhirmack in December 1979. Booth then filed suit alleging that the contract between Jhirmack and Playtex violated the Sherman and Clayton Acts and breached its own contract with Jhirmack.

The *JBL* and *Booth* actions were consolidated for a limited trial on the relevant market and tying issues. *JBL Enterprises v. Jhirmack Enterprises, Inc.,* 509 F.Supp. 357 (N.D.Cal.1981). The definition of the relevant market was crucial to a determination of whether Jhirmack possessed sufficient market power that its vertical nonprice restrictions could amount to an unreasonable restraint of trade. At the time no claims of *per se* antitrust violation had been

made except for the tying claim. The district court concluded that the relevant market was the market for the sale of beauty products (including but not limited to shampoos and conditioners) to PST outlets. Under this definition Jhirmack's market share in 1976–78 was found to be 2.3%, 3.2% and 4.2%, respectively.

Jhirmack then moved for summary judgment against the JBL plaintiffs on the ground that in light of Jhirmack's insignificant market share the alleged restraints could not as a matter of law have had the requisite adverse effect on competition. JBL sought to avoid dismissal on two theories: (1) that Jhirmack's small market share did not establish lack of market power because it faced no interbrand competition; and (2) that Jhirmack engaged in price-fixing, a *per se* violation. The court rejected both theories. On the fraud claim the court found that JBL had presented no facts on two essential elements. Summary judgment was therefore entered on all counts. *JBL Enterprises v. Jhirmack Enterprises, Inc.,* 519 F.Supp. 1084 (N.D.Cal.1981).

In the Booth action, in opposition to defendants' motion for summary judgment, the plaintiffs raised a *per se* claim of price-fixing, alleging that Jhirmack and Playtex conspired to foreclose price competition between Playtex and Booth in the OTC market in violation of Sherman Act § 1. The court granted summary judgment for the defendants on this issue, as well as on a claim against Playtex for inducing breach of contract, and a claim that Booth's termination breached an implied covenant of good faith and fair dealing. Summary judgment was denied on the claim that Playtex's appointment breached the exclusive territory clause of the Booth-Jhirmack contracts, but this claim was later dismissed and that dismissal has not been appealed.

Both sets of plaintiffs appeal the respective grants of summary judgment; the JBL plaintiffs also attack the district court's determination of the relevant market.

ANALYSIS:

I. *The JBL Action*

A. *Per Se* Price-Fixing

■ In *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53

L.Ed.2d 568 (1977), the Supreme Court, while it did "not foreclose the possibility that particular applications of vertical restrictions might justify *per se* prohibition," *id.* at 58, 97 S.Ct. at 2561, held that in general such nonprice restrictions imposed by a manufacturer on distributors or retailers must be tested under the Rule of Reason. The Court found that, while vertical restrictions reduced intrabrand competition, they had redeeming virtues in that they tended to promote interbrand competition. Dealers would be more likely to expend the effort necessary to promote or service a product if they did not have to worry about other dealers of the same product taking a "free ride" on their efforts. Thus the manufacturer who imposed customer or territorial restrictions would be better able to enter the market as a new competitor or maintain its presence as an existing competitor with other manufacturers.

JBL attempts to place itself outside the reach of *GTE Sylvania* by allegations of a conspiracy among Jhirmack, other distributors, and salons to eliminate JBL as a competitor so as to reduce price competition. Its attempt fails.

First, the district court found "no evidence ... that Jhirmack fixed the resale prices for its products or enforced compliance with a particular price schedule." 519 F.Supp. at 1088. Nor was there any indication that suggested prices were in fact adhered to. Thus JBL cannot rely on *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944), where nonprice restraints were imposed to facilitate a vertical price-fixing scheme.

Second, JBL was not a competitor of the complaining salons. Rather, the salons were customers of distributors like JBL. Although the salons may have been concerned with maintaining the prices they charged consumers, the price competition they faced was not from JBL but from other retailers, especially OTC outlets that carried competing brands.

Third, the other distributors, who would have been in competition with JBL but for the territorial restrictions, were not con-

cerned with eliminating price competition from JBL. There is no indication that the complaining distributors wished (or thought they were permitted) to make sales to the OTC outlets at all, much less at a higher price than that charged by JBL. Rather, the clear indication is that the complaining distributors were concerned that their customers (the salons) would stop carrying Jhirmack products if the diversion continued.

■ *Per se* condemnation of apparently vertical restraints may be appropriate where the purpose and effect of those restraints is to limit horizontal competition. In *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3d Cir.1979), plaintiff claimed it had been terminated as a dealer in United's line of kitchen cabinets because a competing dealer complained to the manufacturer that the plaintiff was discounting the cabinets. The Third Circuit found that "a manufacturer deliberately withdrawing its product from a distributor that resold it for a price less than its competitor at the request of the competitor," 595 F.2d at 166, would constitute a *per se* violation. It based its decision on the pernicious effect of the practice—elimination of possible price competition from the foreclosed dealer—and the lack of any redeeming virtue. The court noted that generally manufacturers are free to impose vertical territorial restrictions, but that two factors made United's alleged action unlawful. First, the action was taken at the behest of a competitor *on the same level as the plaintiff;* thus the restraint was horizontal rather than vertical in purpose and effect. Second, the complaining dealer was allegedly seeking to *eliminate price competition.* 595 F.2d at 168.

In order to make out a claim under the reasoning of *Cernuto,* JBL would have to allege that a competitor of JBL prevailed on Jhirmack to terminate JBL in order to eliminate either actual or potential price competition from JBL. No such allegation was made, and the district court correctly granted summary judgment on the price-fixing claim.

### B. Market and Market Share

■ All parties agreed to a separate trial to determine (a) the relevant product and geographic market, (b) Jhirmack's share of that market, and (c) whether Jhirmack imposed *per se* unlawful tying arrangements. Only the market findings are appealed. These are findings of fact and thus subject to a clearly erroneous standard of review. *Twin City Sportservice v. Charles O. Finley & Co.,* 676 F.2d 1291, 1299 (9th Cir.1982). Although market definitions are inherently imprecise, the district court's determination is supported by the available evidence and must be upheld.

As this circuit stated in *Gough v. Rossmoor Corp.,* 585 F.2d 381, 389 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), analysis of whether a particular action restrains competition involves a consideration of its impact "within the field of commerce in which the plaintiff was engaged and upon those commercially engaged in competition within it." In determining what the field of competition is, "courts are not free to accept whatever market is suggested by the plaintiff," *id.* at 389, but must examine the commercial realities within the industry in question.

Defining the market in a case such as this one is actually a two-step process. First the field in which the plaintiff was engaged must be defined in geographic and distributional terms. Then the product (or product line) that competes in that field must be determined. Since the parties stipulated as to the geographic market, the two determinations may be referred to as defining, respectively, the "distributional market" and the "product market." ·

The district court defined the relevant market as "the sale of beauty products, including but not limited to shampoos and conditioners, to beauty salons and other professional outlets." 509 F.Supp. at 369. Under this definition, Jhirmack's market share was less than 5%. JBL disputes both the product and the distributional market determinations, and argues that the market should be defined as the sale of shampoos and conditioners *alone* either *to* professional outlets or, alternatively, *by* professional outlets. Although, as stated above, the district court found that the relevant market existed at the wholesale level (sales *to* salons), it carefully considered claims that a distinct submarket existed in the sale of shampoos and conditioners at the retail level (sales *by* salons). The court concluded, however, that *if* the relevant distributional market were to be found at the retail level, PST outlets faced competition from OTC outlets selling similar products, and so the relevant market would be the sale of shampoos and conditioners by all retail outlets. Under this market definition, Jhirmack's market share would have been less than 1% of shampoos and approximately 2% of conditioners.

We find it unnecessary to address these alternative findings, however, because the district court correctly defined the relevant distributional market. JBL is engaged in the distribution of Jhirmack products to specific retailers, i.e., it operates as a wholesaler. It competes for PST customers with other wholesalers—some of whom also carry a single (competing) line, others of whom carry the products of many manufacturers.

■ The court's product market determination must also be upheld. The standard test of the product market is that it comprises those "commodities reasonably interchangeable by consumers for the same purpose." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). However, this principle must be applied with reference to the specific market involved. So long as the distributional market is set at the wholesale level, the fact that face creams and shampoos do not have the same use for the consumer is not as relevant as whether a "cluster" or "product line" of one manufacturer is reasonably interchangeable for that of another by the salon that is making the purchase.

This cluster approach is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products

considered separately. Thus the full service features of commercial banks led the Supreme Court to find a cluster of products and services as the relevant product market in *United States v. Philadelphia National Bank*, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963), and *United States v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 360, 90 S.Ct. 2035, 2041, 26 L.Ed.2d 658 (1970). The rationale was that consumers do not generally shop for individual banking services, especially because it is usually easier to obtain some services, e.g., loans, at the same bank where other services, e.g., savings accounts, are held. Such an approach was used in *A.G. Spalding & Bros., Inc. v. FTC*, 301 F.2d 585, 604 (3d Cir.1962), where the court found the relevant market to be "higher priced" athletic goods because each of the major manufacturers promoted and distributed such goods as a line.

In this case, eighty percent of Jhirmack's sales were of shampoos and conditioners. It did, however, manufacture a full line of beauty products and required each distributor to purchase a small amount of each product for potential sale to PST outlets. The industry generally considers it necessary to carry a full line, and advertising and promotion often group the products. Although salons do purchase individual products, this generally occurs when the particular product is not available in the main product line chosen by the salon. The court thus reasonably concluded that Jhirmack faced competition (at the wholesale level) for PST sales from other product lines, and not only from other shampoos and conditioners.

### C. Market Power

■ The trial court found that Jhirmack's market share was 2.3%–4.2% of beauty products sold to PST outlets (or 1%–2% of shampoos and conditioners sold by all retail outlets). These shares are too small for any restraint on intrabrand competition to have a substantially adverse effect on interbrand competition. *See, e.g., Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1379 (9th Cir. 1981) (1.87% or 5.2%); *Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d 620, 627 (9th Cir.1977) (2% or 3%). JBL's contentions that Jhirmack possessed sufficient market power to significantly affect interbrand competition despite its insignificant market share are unsupported and were properly rejected at trial.

### D. Fraud or Negligent Misrepresentation

■ JBL's contract with Jhirmack required JBL to purchase a minimum quantity of products each month. The contract states that JBL "acknowledges that the minimum purchase requirements provided herein are fair, just and reasonable." JBL claims that this statement is a fraudulent representation because the quotas were in effect a statement of the minimum revenues JBL could expect from the distributorship.

The district court found it "doubtful that quotas incorporated into a distributor['] s agreement afford a basis for a later fraud claim based on the distributor's failure to attain them." 519 F.Supp. at 1089. Such a theory would, in effect, make the manufacturer an insurer of the distributor's business. The court found it unnecessary to reach this issue, however, because it concluded that JBL had failed to factually support two elements: (1) that the representations were made negligently or with intent to defraud; and (2) that JBL relied on the representations. We find no error in this conclusion.

### II. *The Booth Action*

Booth contends that Jhirmack's promise to it of an exclusive distributorship meant that if Jhirmack moved into the OTC market within Booth's territory, it would have to do so through Booth. Since the contract also specified that Booth agreed to exclusively devote its full time to the PST outlets, Jhirmack and Playtex contend that the OTC market was excluded from the contract. The district court denied summary judgment on this issue, and Booth has not

appealed the later dismissal of the claim. In any event, this contract claim is irrelevant to whether Jhirmack conspired with Playtex to foreclose competition, violated a covenant of good faith and fair dealing, or was induced by Playtex to breach.

### A. The Antitrust Claims

■ Booth claims that Jhirmack and Playtex conspired to foreclose competition in the OTC market for Jhirmack products in order to allow Playtex to fix prices in that market. It alleges, first, that the agreement between Jhirmack and Playtex, by giving Playtex an exclusive OTC license, violated Sherman Act § 1; and second, that its termination for refusing to accede to that agreement likewise violates the Act.

Booth does not dispute that Jhirmack could, without violating the antitrust laws, decide to appoint only one OTC distributor and refuse to appoint any others, even if the net result of this course of action was to shield the sole distributor from potential price competition. *See GTE Sylvania,* 433 U.S. at 54–55, 97 S.Ct. at 2559–60; *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,* 637 F.2d at 1388. Booth's position, however, is that there already was competition, or at least potential competition, in the OTC market (i.e., Booth), and that the agreement was designed to eliminate that competition. It is difficult to square the contention that the Jhirmack-Playtex agreement would decrease intrabrand competition without increasing interbrand competition with Booth's position that if Jhirmack wanted to enter the OTC market it would have to do so through Booth, who had an exclusive territorial license. Had Jhirmack taken the route suggested by Booth, it would be Booth, and not Playtex, who would be insulated from price competition from any other OTC distributor in its territory. And Booth would not face any intraband competition between PST and OTC outlets, since it would control distribution to both.

Although there are indications that Jhirmack did not always interpret its contract with Booth as *prohibiting* sales to OTC outlets, it is clear that, as the district court noted, "Jhirmack's products had not theretofore been officially distributed to OTC outlets, having been generally limited to professional outlets except for sporadic diversion." 519 F.Supp. at 1091. It is also clear that Jhirmack considered a substantial promotional campaign as a prerequisite to its ability to compete successfully with other shampoos and conditioners available in OTC outlets. Playtex's promise to spend seven million dollars on promotion during the first year of its distributorship and substantial amounts thereafter fulfilled that prerequisite. While there is no allegation that Jhirmack would *never* have entered the OTC market had it not been able to find a distributor able and willing to engage in substantial promotional activity, the admittedly heavy interbrand competition existing in the OTC market for shampoos and conditioners makes it extremely unlikely that it would have entered at the time it did or that it would have been able to add effectively to that interbrand competition if it had chosen to do so without such a campaign. Jhirmack considered such an arrangement necessary and the realities of the market make that assumption quite reasonable.

The district court was therefore justified in concluding that "[t]he primary effect of the Jhirmack-Playtex agreement on competition in OTC channels was to add the competitive activity of a major distributor and to increase the amount of Jhirmack products available to consumers in OTC outlets.... Moreover, the agreement also provided a new source of intrabrand competition for Jhirmack products sold in salons." 519 F.Supp. at 1091.

Since the initial agreement between Playtex and Jhirmack did not violate antitrust law, Playtex could certainly ask Jhirmack for aid in enforcing it without incurring antitrust liability. Booth, like JBL, seeks to invoke *Cernuto,* but again the situation is not analogous. In *Cernuto,* the manufacturer had not granted an exclusive license to any of its dealers. Rather it was providing kitchen cabinets to both dealers Famous

and Cernuto. Famous, however, wanted to eliminate competition, and used its influence over the manufacturer to secure Cernuto's termination as a dealer, thereby creating a net loss of intrabrand competition without any net increase in interbrand competition. Under *Cernuto's* circumstances, *per se* condemnation may be appropriate; under the circumstances presented here, it is clearly inappropriate.

### B. Good Faith and Fair Dealing

Booth claims that Jhirmack breached an implied covenant of good faith and fair dealing by terminating Booth for refusing to recognize Jhirmack's "illegal" contract with Playtex. Since that contract does not violate the antitrust laws, the district court properly rejected this claim.

### C. Tortious Interference

The heart of Booth's tortious interference claim parallels its antitrust claims. Booth argues that its contract with Jhirmack conferred on it the right to sell OTC, that Playtex knew Booth had that right, and that Playtex induced Jhirmack to take that right away from Booth and give it to Playtex.

Whether Booth's contract did in fact confer OTC rights on Booth so that Jhirmack could have breached that contract in giving those rights to Playtex is not at issue here. What matters is whether *Playtex* knew that Booth had OTC rights in its territory. The elements of a claim of tortious interference are (1) a valid contract, (2) knowledge of the contract and *intent to induce its breach;* (3) breach; (4) causation, and (5) damage. *Richardson v. La Rancherita,* 98 Cal.App.3d 73, 80, 159 Cal.Rptr. 285 (1979). In this case it is clear that Playtex had no reason to believe that Booth and other PST distributors had any OTC rights and therefore could not have intended that they be breached. Playtex *was* worried that distributors who diverted products to the OTC market had not bound themselves to incur heavy promotion costs, and would be able to "free ride" on Playtex's efforts, and undersell it. But there is no indication

that it considered that diversion to be contractually sanctioned.

The district court's judgments are AFFIRMED in all respects.